PER CURIAM.
Robert Brian Waterhouse, a prisoner under sentence of death, appeals the denial of his successive motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. On January 4, 2012, the Governor signed a death warrant for Waterhouse, with the execution scheduled for February 15, 2012. Waterhouse subsequently sought postconviction relief in the circuit court, presenting two claims. The circuit court summarily denied relief on one claim and ordered an evidentiary hearing on the other. Following an evidentiary hearing, the circuit court denied relief on Water-house’s second claim. For the reasons *87 discussed below, we now affirm the circuit court’s orders and deny Waterhouse’s request for a stay of execution.
FACTS AND PROCEDURAL HISTORY
On September 2, 1980, Robert Water-house was convicted of the first-degree murder of Deborah Kammerer. The facts of the murder were stated in the opinion of this Court affirming the judgment and sentence of death in the initial direct appeal:
On the morning of January 3, 1980, the St. Petersburg police responded to the call of a citizen who had discovered the dead body of a woman lying face down in the mud flats at low tide on the shore of Tampa Bay. An examination of the body revealed severe lacerations on the head and bruises around the throat. Examination of the body also revealed— and this fact is recited not for its sensationalism but because it became relevant in the course of the police investigation — that a blood-soaked tampon had been stuffed in the victim’s mouth. The victim’s wounds were such that they were probably made with a hard instrument such as a steel tire changing tool. Examination of the body also revealed lacerations of the rectum. The cause of death was determined to have been drowning, and there was evidence to indicate that the body had been dragged from a grassy area on the shore into the water at high tide. The body when discovered was completely unclothed. Several items of clothing were gathered from along the shore at the scene.
The body showed evidence of thirty lacerations and thirty-six bruises. Hemorrhaging indicated the victim was alive, and defense wounds indicated she was conscious, at the time these lacerations and bruises were inflicted. Acid phosphotase was found in the victim’s rectum in sufficient amount to strongly indicate the presence of semen there. Also, the lacerations in this area indicated that the victim had been battered by the insertion of a large object. The medical examiner was also able to determine that at the time of the murder the victim was having her menstrual period.
After several days of investigation the police were unable to identify the victim, so they announced the situation to the public. They then received an anonymous telephone call simply informing them of appellant’s automobile tag number and advising them to investigate it.
The police also learned the identity of the victim from two of her neighbors. These two acquaintances, Yohan Wenz and Carol Byers, testified at trial that they went to the ABC lounge with the victim on Wednesday night, January 2, 1980. They testified that they later left the lounge and that Ms. Kammerer remained there at that time. Kyoe Ginn, who was working there as a bartender that night, testified that the victim came into the bar with a man and a woman, that they later left, that Ms. Kammerer then began talking with appellant (who was known to the witness) and that at about 1:00 a.m. appellant and Kammerer left the bar together.
On the evening of January 7, 1980, police officers asked appellant to voluntarily go with them to police headquarters for an interview. At this time he said that he did not know any girl named Debbie and that he went to the ABC lounge on January 2 but did not leave with a woman. After this interview appellant was allowed to leave but his car was impounded for searching pursuant to warrant. The automobile was searched on January 8 and appellant was arrested on January 9.
*88 Detectives Murry and Hitchcox arrested appellant. In the car on the way to the police station, after advising appellant of his rights, Hitchcox asked him, “We were right the other night, weren’t we, when we talked to you about being involved in this case?” Appellant responded simply, “Might.” Shown a picture of Deborah Kammerer, appellant this time admitted that he did in fact know her.
On the afternoon of January 9, the detectives again interviewed appellant. Detective Murry testified concerning this interview. She said that appellant became emotionally upset and said repeatedly that his life was over, that he was going to the electric chair. He said that he wanted to talk to his interviewers as people and not as police officers. He then said that he had some personal problems with alcohol, sex, and violence.
The two detectives interrogated appellant again on January 10. Again appellant said he wanted to talk to them as people rather than as police officers. Detective Murry testified that appellant again indicated that he experienced a problem involving sexual activity. He said that when he drinks a lot, it is like something snaps and he then finds himself doing things that he knows are terrible and bad, and that he cannot control his behavior on such occasions. Appellant also told the officers that when he wanted to engage in sexual activity with a woman but learned that she was having her menstrual period, he would become frustrated and angry and that this is what had happened the previous Wednesday night [i.e., the night of the murder]. He also said that he had had a lot to drink on Wednesday night.
Inspection of the interior of appellant’s car revealed the presence of visible blood stains, and a luminol test revealed that a large quantity of blood had been in the car but had been wiped up. Analysis of the blood in the car and comparison with known blood samples of appellant and the victim revealed that the blood in appellant’s car could have come from the victim but was not appellant’s blood.
A forensic blood analyst testified that it is possible through analysis of blood stains on certain surfaces to make estimates concerning the direction and velocity of motion of the blood making the stains. This witness concluded from her analysis that the blood in appellant’s car was deposited in the course of a violent attack.
A forensic hair analyst testified that hairs found in appellant’s car were consistent in their characteristics with known hair samples from the victim.
A forensic fiber analyst testified that fibers found in the debris adhering to the victim’s coat were similar to fibers from the fabric of the seat cover in appellant’s car. Also, fibers were found in the car that had the same characteristics as fibers from the victim’s coat and pants.
Appellant was employed as a plaster and drywall worker. His foreman testified at trial that on the morning of January 3, appellant arrived at work asking for the day off. He appeared to have a hangover and said he was feeling rough. The witness said that at this time appellant had scratches on his face. The witness also said that appellant had told him that he liked anal intercourse and liked being with women who allowed themselves to be hit and slapped.
Waterhouse v. State, 429 So.2d 301, 302-04 (Fla.1983) (Waterhouse I), cert. denied, 464 U.S. 977, 104 S.Ct. 415, 78 L.Ed.2d 352 (1983). The jury recommended, and the trial court imposed, a sentence of death. *89 See id. at 302. On direct appeal, this Court affirmed the conviction and sentence. See id. The Court also affirmed the denial of Waterhouse’s initial rule 3.850 motion for postconviction relief. See Waterhouse v. State, 522 So.2d 341, 342 (Fla.1988) (Waterhouse II). However, the Court granted Waterhouse’s petition for writ of habeas corpus and vacated his death sentence because the trial court failed to instruct the jury to consider evidence of nonstatutory mitigating circumstances in violation of Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), and Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). See Waterhouse II, 522 So.2d at 344.
After a resentencing proceeding, a unanimous jury again recommended a sentence of death, and the trial court followed the jury’s recommendation. On appeal, this Court affirmed the sentence. See Waterhouse v. State, 596 So.2d 1008, 1018 (Fla.) (Waterhouse III), cert. denied, 506 U.S. 957, 113 S.Ct. 418, 121 L.Ed.2d 341 (1992). The Court subsequently affirmed an order that summarily denied Waterhouse relief under Florida Rule of Criminal Procedure 3.850, see Waterhouse v. State, 792 So.2d 1176, 1196 (Fla.2001) (Waterhouse IV), and denied a petition for writ of habeas corpus filed by Waterhouse, see Waterhouse v. Moore, 838 So.2d 480, 484 (Fla.2002) (Waterhouse V). Finally, in October 2006, this Court affirmed an order that denied a motion for postconviction DNA testing filed by Waterhouse pursuant to Florida Rule of Criminal Procedure 3.853. See Waterhouse v. State, 942 So.2d 414 (Fla.2006) (table decision).
On January 4, 2012, the Governor signed a death warrant for Waterhouse, with the execution scheduled for February 15, 2012. Following the signing of the death warrant, Waterhouse filed a successive motion for postconviction relief, asserting two claims.
1. Execution of an inmate should be constitutionally prohibited when a person under sentence of death who has consistently maintained his innocence, and who in good faith has filed a motion for postconviction DNA testing to establish his innocence, is precluded from obtaining testing due to the destruction of evidence through the negligence of a government agency in violation of state law.
2. Waterhouse was denied an adversarial testing during his capital trial due to the failure of the State to disclose a material witness under Brady v. Maryland, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), and the presentation of false testimony under Giglio v. United States, 405 U.S. 150 [92 S.Ct. 763, 31 L.Ed.2d 104] (1972), in light of the affidavit of Leglio Sotolongo which, in the alternative, may also be construed as newly discovered evidence.
Waterhouse also sought a stay of execution.
With regard to the first claim, Water-house stated that in the context of a prior rule 3.853 motion for postconviction DNA testing, it was determined that the Office of the Clerk of the Sixth Judicial Circuit of Florida had destroyed “all evidence in this case” in violation of section 43.195, Florida Statutes (1987).[1] Waterhouse contended *90 that as a result of this negligent destruction, he is precluded from establishing his innocence of the murder through DNA testing. Waterhouse asserted that the negligent destruction of potentially exculpatory evidence by a state agency should operate as a bar to execution under the fundamental rights guaranteed by the Florida and United States Constitutions. In support of this assertion, Waterhouse referenced two states — North Carolina and Virginia — where executions allegedly were precluded due to the destruction of evidence. Waterhouse claimed that this issue is different from that which he previously presented in his rule 8.858 motion:
The issue of retroactivity is inapplicable as this presents a question of first impression and seeks the recognition of a fundamental constitutional right for the first time. The claim has not been previously raised because until the warrant was signed the issue was not ripe for review.
Waterhouse’s second claim arises from an affidavit signed by Leglio Sotolongo on January 9, 2012. According to the affidavit, Sotolongo was employed as a doorman at the ABC lounge. He was at the lounge on the night of the murder, but cannot remember if he was actually working that night. Sotolongo averred that he remembers that night particularly because Waterhouse repaid money that he had previously borrowed from Sotolongo. So-tolongo states that Waterhouse arrived at the ABC lounge at approximately 7-8 p.m. After the murder, Sotolongo informed the police that he saw Waterhouse leave with two men. Sotolongo states, “I cannot be precise regarding the time, but it was before closing time, which was 2:00 A.M.” He also stated that, from her position at the center bar, bartender and State witness Kyoe Ginn would not have been able to see the exit door to the lounge. According to Sotolongo, although he informed Detective Gary Hitchcox that he saw Waterhouse leave the lounge with two men, the police report prepared by Hitchcox instead stated that Sotolongo did not “remember when Mr. Waterhouse left the lounge.” Sotolongo states that this portion of Hitchcox’s police report “is false.” Sotolongo also states that after his interview with Hitchcox, Sotolongo and Leon Vasquez, a bouncer who was working at the ABC lounge on the night of the murder, encountered the detective at Murphy’s Bar. According to the affidavit:
Detective Hitchcox came up to us and got into our faces. The Detective accused us of trying to protect a murderer. The situation was such that there was almost a physical altercation, but there wasn’t, and we left the bar.
Waterhouse’s motion sets forth Sotolongo’s address and phone number, and states that had Sotolongo been contacted, he would have been available to testify at the time of trial and the postconviction proceedings.
Waterhouse argued that, in failing to disclose Sotolongo’s exculpatory statement, the State committed a Brady violation. Waterhouse asserted that Soto-longo’s testimony would have not only impeached that of bartender Ginn, who testified that she saw Waterhouse leave with the victim, but would have also corroborated the testimony of defense witness Leon Vasquez, who testified that he saw Waterhouse leave the lounge with two men. Waterhouse next argued that, by knowingly permitting bartender Ginn to falsely testify that she saw the victim and Waterhouse leave together, the State committed a Giglio violation. Finally, *91 and in the alternative, Waterhouse contended that the affidavit of Sotolongo constituted newly discovered evidence, which could not have been discovered previously due to the false statement in Detective Hitchcox’s police report. According to Waterhouse, impeachment of bartender Ginn was critical to Water-house’s defense and, if Sotolongo had been allowed to testify, the outcome of the trial would have been different.
Waterhouse attached to his motion nearly identical affidavits of guilt-phase defense counsel. The trial level attorneys averred that they relied upon Detective Hitchcox’s report being an accurate and truthful statement from Sotolongo. Because they relied upon the veracity of the report, “apparently no one from the defense team contacted or spoke with Mr. Sotolongo prior to trial.” Both attorneys stated that, had they been aware of Soto-longo’s statement, they would have presented him as a witness “for the purpose of impeaching Ms. Ginn and to corroborate other defense testimony [i.e., that of Leon Vasquez].”
On January 13, 2012, the postconviction court held a rule 3.851 case management conference on Waterhouse’s successive motion. After that hearing, the court issued an order that summarily denied the destruction of evidence claim as improperly pled, procedurally barred, successive, and untimely. The postconviction court first held that, since Waterhouse is seeking the recognition of a new fundamental right, rather than retroactive application of an established fundamental right, this claim is not properly pled under rule 3.851(d)(2)(B). The court next found that the issue presented in this first claim “[has] already been litigated and considered in the courts through Waterhouse’s prior motion for postconviction DNA testing and subsequent appeal. Therefore, the current iteration of the claim is barred from review.” The postconviction court also concluded that this claim is not timely because even though Waterhouse chose not to raise this claim until the warrant was signed, “nothing prevented [him] from addressing this matter years earlier.” Lastly, with regard to Waterhouse’s reliance on recent actions in North Carolina and Virginia, the postconviction court found that “[t]he decisions of the executive branches in other states have no legal bearing upon this court.”
The postconviction court granted an evi-dentiary hearing on the second claim, which was based upon the affidavit of Leg-lio Sotolongo. In ordering an evidentiary hearing, the postconviction court relied upon Mungin v. State, 79 So.3d 726 (Fla.2011), in which this Court reversed a summary denial of Brady and Giglio claims and remanded for an evidentiary hearing.[2]

The Evidentiary Hearing

The postconviction court held the evi-dentiary hearing on January 17, 2012. Waterhouse advised the court by telephone that he chose to waive his personal appearance at the hearing. The testimony of Leglio Sotolongo was presented by Wa-terhouse, and Detective Gary Hitchcox was presented as a witness by the State. Waterhouse’s guilt-phase trial counsel did not testify during the evidentiary hearing. Instead, the State and Waterhouse stipulated that trial counsel would have testified consistent with affidavits filed with the court.
*92 Sotolongo testified that in 1980, he was moonlighting as a doorman at the ABC lounge in St. Petersburg. Detective Hitchcox questioned Sotolongo in reference to the homicide. While Sotolongo did not recall Hitchcox showing him a photo of the victim, Sotolongo stated that he would not dispute that this occurred if Hitchcox testified to this fact. Sotolongo testified that it was his belief that he was working at the ABC lounge on the night of the murder; however, when shown Detective Hitchcox’s report — which stated that Soto-longo was at the bar, but not working that night — Sotolongo testified, “If I said it to [Hitchcox] way back then, then that recollection, if true, is probably more accurate than not.”
Although Sotolongo stated in his affidavit that he remembers the night of January 2, 1980, because Waterhouse paid So-tolongo money that he had previously borrowed, Sotolongo testified during the evidentiary hearing that Waterhouse may have actually repaid him the previous night. While Sotolongo was certain that he saw Waterhouse leave the ABC lounge with two males that night, he had difficulty specifying the time that this occurred, as evidenced by the following exchange during cross-examination:
Q: Now, and you’re fairly clear in your affidavit. [Y]ou say you saw him leave the lounge. You can’t be precise as to what time he left?
A: That’s correct.
Q: Okay. But it was before closing?
A: Yes.
Q: That’s pretty fair to say, correct? I mean, he was going to have left before closing, right?
A: Agreed.
Q: Okay. But you don’t know if that was 12:15,12:30?
A: Correct.
Q: Because if you were working, you would have been there that late. But it’s possible that you left early that night, right?
A: I didn’t leave early that night, but it is possible. You’re right. I mean, that is almost counter-indication [sic].
Q: Well, I guess what I’m asking then, what time did you leave that night?
A: I don’t know exactly. If I was working, then I left past 2:00.
Q: Okay. And if you weren’t working, you could have left—
A: Earlier.
Q: 12:00,1:00,10:00,11:00?
A: No. No. No.
Q: Okay. Well, let’s talk some parameters here. What time could you have— could you have left at midnight?
A: I remember him leaving that bar towards the end of the shift.
Q: Okay. You weren’t working. So towards the end of the night?
A: Well, sir, like I said, I believe that I was working that evening.
Q: Okay.
A: But you indicate that I stated that I might not have.
[[Image here]]
A: ... let me word it this way, towards the end of the evening.
Q: But you can’t say when that was.
A: Correct.
Q: You can’t tell if it’s quarter to 12:00, quarter after 12:00,12:30,1:00?
A: You are correct.
Q: And if you weren’t working, is it possible that you weren’t there at the end of the evening? Let’s just say that you saw Mr. Waterhouse leave.
A: Right.
Q: Is it possible after he left you left but the bar hadn’t closed—
*93 A: No.
Q: —if you weren’t working?
A: I was there the whole evening.
Q: From start to finish?
A: Yes.
Q: You’re sure.
A: I’m not positive.
Q: Okay. So I will ask you again.
A: Yes.
Q: Is it possible now—
A: No. I understand. I understand. And believe me, from the sound that I just made, I’m not being facetious. It is. It is a long time ago, and you’re correct. Forgive me.
Sotolongo also admitted that his memory was better thirty-two years ago than it is now.
Sotolongo testified that from her position at the bar, bartender Kyoe Ginn would not have been able to see the exit at which Sotolongo was supposedly working that night, which was also the exit through which Sotolongo observed Waterhouse leave. However, Sotolongo acknowledged that there was a second exit to the lounge, and it was possible that Ginn could see that other exit. Sotolongo also conceded that if he was checking identifications at the exit referenced in his affidavit, he would not have been able to see what was happening in the lounge. Sotolongo stated that he knew bouncer Leon Vasquez, and that Vasquez testified during trial that he had seen Waterhouse leave the lounge with two men. When asked by the post-conviction court why Sotolongo did not seek out the defense attorneys during Wa-terhouse’s trial, Sotolongo replied, “I thought things would evolve the way they’re supposed to. Since I gave my statement to the detective, I thought that my testimony probably wasn’t needed, and that’s why I wasn’t called to testify.”
Detective Gary Hitchcox admitted that he did not have an independent recollection of the interview with Sotolongo, and he was testifying to what was provided in his 1980 report. However, Hitchcox explained that, during his time with the police department, when he conducted an interview, he would take notes on a notepad and then dictate his report from those notes. According to the report, Sotolongo told Hitchcox that he was at the ABC lounge on the night of the murder from 10:00 p.m. until 1:00 a.m. Hitchcox denied that during the interview Sotolongo ever stated he saw Waterhouse leave the bar with two men and testified that Sotolon-go’s affidavit is false.[3] Hitchcox testified that if Sotolongo had informed him of this fact during the interview, he would have “Absolutely” included it in his report.
On cross-examination, Hitchcox admitted that the notes he took during the interview with Sotolongo no longer exist. When asked if he would have omitted information from his report about Sotolongo observing Waterhouse leave the lounge, Hitchcox replied:
[T]wo men leaving with the suspect would be very important. We would want to pursue that. I would — that would be something that I would get excited about as an investigator. [Soto-longo] told me he didn’t see [Water-house] leave, and there was nothing said about leaving with two men. That would have been in the report.
When asked why he did not write a report about bouncer Leon Vasquez, Hitchcox stated that he did not recall interviewing Vasquez. When presented with his 1980 *94 trial testimony during which he testified that he interviewed Vasquez, Hitcheox stated:
[T]he only thing that I can tell you about that is I testified to interviewing Vasquez. I would think that there would be a police report indicating that I interviewed him with the same type of setup: Me interviewing, where it happened, when I talked to him, what he said. And I don’t have that.
[[Image here]]
So my testimony at that trial had to be from my knowledge back what, 32 years ago, of some type of documentation which would be maybe a police report, something to that effect,, and what I testified to in court would have been my knowledge of either my report, another report, a deposition, something to reflect my memory, or perhaps just from memory.
When asked by the postconviction court whether other officers were investigating the murder and taking statements from witnesses, Hitcheox replied in the affirmative. On redirect, Hitcheox testified that he would have been privy to any reports that other detectives compiled about Vasquez.
After testimony concluded, but before closing statements, the State argued that Waterhouse’s postconviction counsel had failed to demonstrate due diligence in discovering Sotolongo and, therefore, the rule 3.851 motion was untimely. In making this assertion, the State noted that Water-house’s current counsel had represented Waterhouse since 2003. According to the State, Waterhouse’s current counsel must “show that he did everything he could going through this file, looked at all these witnesses, and could not find this witness. He’s not made that representation.” Counsel for Waterhouse responded as follows:
[Sjimilar to what the Defense attorney[sic] said in their affidavit, that I in reading [Detective Hitchcox’s report] would sit there and read it and take it on face value that that’s what [Sotolon-go’s] statement said. And as a Defense attorney frankly — and I think the Supreme Court recognizes this in Mungin, and what disturbed them in Mungin was the fact that they felt officers of .the Court, attorneys, should be able to rely on police reports. And it would disturb them that attorneys are put in a position of relying on police reports that aren’t true.
And so I would have read that. I have read the discovery in the ease. I would have accepted it on face value just like [defense counsel] did. So that’s the answer.
During closing statements, counsel for Wa-terhouse abandoned the Giglio claim.

Order Denying Successive Postconviction Relief

On January 20, 2012, the postconviction court entered an order denying relief on Waterhouse’s second claim. First, the postconviction court found that Water-house had satisfied the first prong of the standard for newly discovered evidence, concluding that Waterhouse had established that Sotolongo’s testimony was unknown by Waterhouse, his counsel, or the circuit court at the time of trial and could not have been discovered by due diligence.[4] The postconviction court relied on Mungin in reaching this conclusion:
*95 As alluded to by the Court in Mwngin, it is difficult to discern how counsel would have known of the substance of Sotolon-go’s testimony, as stated in the January 9, 2012 affidavit, if they had relied upon the truthfulness of Hitchcox’s police report. Mwngin further leads this [e]ourt to conclude that due diligence surely does not require that counsel allocate limited pre-trial resources in investigating a witness that is reported by police to have said something contrary to what the witness now claims.
See Mungin, 79 So.3d at 737 (“We are troubled by the possibility that a false police report was submitted and then relied on by defense counsel.”).
However, the postconviction court further held that Waterhouse had failed to establish the second prong of a claim for relief based upon newly discovered evidence “because Sotolongo’s testimony is not of such a nature that it would probably produce an acquittal on retrial in that it would not give rise to a reasonable doubt as to Waterhouse’s culpability.” In reaching this conclusion, the postconviction court comprehensively detailed the facts that provided both direct and circumstantial evidence of Waterhouse’s guilt. In addition to the facts detailed by this Court in Waterhouse I, see 429 So.2d at 302-04, the postconviction court discussed additional facts from the trial court record:
1. Waterhouse informed police that nobody had used his vehicle for at least two weeks prior to the murder.
2. During the January 9, 1980, interview with police, in addition to stating that his life was over and that he was going to the electric chair, Wa-terhouse also stated that “nothing will bring her back.”
3. On January 10, 1980, Waterhouse discussed his problems with alcohol and violence with the police, explaining that “this problem would just come over him very quickly, like flipping a switch.” Waterhouse advised the police that on the night of the murder he consumed eight or nine beers before arriving at the ABC lounge and four or five white russians while at the lounge. After admitting to this heavy alcohol consumption, Waterhouse asked the police, “why do you think I quit drinking since Wednesday night?”
4. During trial, bartender Kyoe Ginn testified that after the night of the murder, Waterhouse only drank orange juice when he came to the ABC lounge and left the lounge pri- or to closing.
5. During the January 10 interview, Waterhouse admitted that he knew the victim for at least six months prior to the murder, and that they had engaged in sexual intercourse on approximately three occasions.
6. Robert Van Vuren, the foreman at Waterhouse’s place of employment, testified that, in addition to Water-house appearing at work on the day after the murder with scratches on his face, Waterhouse seemed to be wearing makeup on January 7, 1980, i.e., four days after the murder, in an effort to cover the scratches. Van Vuren also testified that he had previously seen a tire tool in Water-house’s vehicle.[5]
7. Inmate Kenneth Young testified with regard to an incident that occurred in the jail while Young’s trial was pending. According to Young, Waterhouse held a shank to the *96 throat of another inmate and ordered everyone else, except the captive inmate, out of the room. Young testified that Waterhouse left the room a few minutes later and stated, “I wonder how he’d like a Coke bottle up his ass like I gave her.” The medical examiner testified during trial that the victim’s rectum was damaged consistent with a foreign object, such as a Coke bottle, being inserted. The police found a Coke bottle inside Waterhouse’s vehicle.
8. When Waterhouse learned that Van Vuren would be called as a witness to testify that Waterhouse appeared at work on January 3 with scratches on his face, Waterhouse told Inmate Young that Van Vuren was incorrect. Waterhouse instead told Young that he was so scratched up that he did not go to work at all that day.
9. Kenneth Norwood, who lived with Waterhouse at the time of the murder, testified that on January 3, he saw Waterhouse washing his car, and it appeared that he was cleaning the interior of the vehicle.
The postconviction court concluded that, in light of the testimony and evidence presented during trial, “Sotolongo’s testimony would probably not produce an acquittal on retrial.” The postconviction court further found that Sotolongo’s testimony that he saw Waterhouse leave the lounge with two men “was not reliable because of the long passage of time, the fact that his memory when interviewed by Hitchcox was closer to the time of the event, and his memory at the time of the January 12, 2012 evidentiary hearing was admittedly weaker.” The postconviction court also noted that the testimony of Sotolongo was cumulative to that of bouncer Leon Vasquez, which left open the time frame that Waterhouse could have returned to the lounge later that evening. Finally, the court noted that “Vasquez’s testimony was contrary to [bartender] Ginn’s testimony and it was the jury’s function to weigh the credibility of these witnesses in accepting or rejecting the testimony relied upon in reaching a verdict.”
With regard to the Brady claim, the postconviction court held that Waterhouse was not entitled to relief. First, the court found that Sotolongo’s testimony would have impeached the testimony of bartender Ginn, and corroborated the testimony of bouncer Vasquez, thereby satisfying the first prong of Brady. However, the court determined that this evidence had not been suppressed by the State and, therefore, failed the second prong of a Brady claim. In reaching this conclusion, the court found that Waterhouse failed to establish the police report was, in fact, falsified:
[T]he description of Sotolongo’s interview by Hitchcox is more reliable since it was reduced to writing at the time of the interview. Additionally, the passage of time and Sotolongo’s weak recollection militate against the reliability of Sotolongo’s statements.
Finally, the postconviction court found that, even if Waterhouse had met the second prong of Brady, Waterhouse failed to demonstrate entitlement to relief because he could not establish prejudice under the third prong of Brady due to the “other uncontroverted evidence presented by the State, including Waterhouse’s own incriminating statements, and the physical and circumstantial evidence against him.”
Waterhouse filed his Notice of Appeal on January 20, 2012. On January 23, the State filed a notice of cross-appeal, challenging the postconviction court’s determination that Waterhouse’s second claim was timely filed pursuant to rule 3.851(d)(2)(A).
*97 ANALYSIS

Destruction of Evidence Claim

Standard of Review
In his first claim, Waterhouse appeals the summary denial of his claim that his execution should be barred because he was unable to obtain DNA testing of certain exhibits due to their premature destruction by the Clerk’s Office of the Sixth Judicial Circuit. We have explained that “[t]he decision of whether to grant an evi-dentiary hearing on a rule 8.851 motion is ultimately based on the written materials before the court, and the ruling of the postconviction trial court on that issue is tantamount to a pure question of law subject to de novo review.” Troy v. State, 57 So.3d 828, 884 (Fla.2011) (quoting Davis v. State, 26 So.3d 519, 526 (Fla.2009)).
Sufficiency of the Pleading
Under Florida Rule of Criminal Procedure 3.851(d)(1), “[a]ny motion to vacate judgment of conviction and sentence of death shall be filed by the prisoner within 1 year after the judgment and sentence become final.” A claim is properly raised in a rule 3.851 motion beyond the time limits articulated in subdivision (d)(1) only where:
(A) the facts on which the claim is predicated were unknown to the movant or the movant’s attorney and could not have been ascertained by the exercise of due diligence, or
(B) the fundamental constitutional right asserted was not established within the period provided for in subdivision (d)(1) and has been held to apply retroactively, or
(C) postconviction counsel, through neglect, failed to file the motion.
Fla. R.Crim. P. 3.851(d)(2). As noted by the postconviction court’s summary denial order, Waterhouse’s claim does not satisfy any subdivision of rule 3.851(d)(2) and is, therefore, improperly included in the present successive motion.[6] First, Waterhouse has been aware of the destruction of evidence from his case since at least October 15, 2003, when the State announced in its response to Waterhouse’s Rule 3.853 Motion for Postconviction DNA Testing that the evidence at issue had been erroneously destroyed. Second, Waterhouse himself acknowledges that he is not seeking relief under an existing fundamental right, but instead “seeks the recognition of a fundamental constitutional right for the first time.” Waterhouse does not rely upon a single case in which such a right has previously been recognized. Accordingly, the destruction of evidence claim raised by Waterhouse is not properly pled in a successive rule 3.851 motion, and the postcon-viction court properly denied Waterhouse’s first claim on this basis.
Procedural Bars
Further, we agree with the postconviction court that this claim is also procedurally barred, successive, and untimely. A prior challenge to the destruction of DNA evidence in this case was thoroughly litigated and resolved against Waterhouse.
On September 30, 2003, Waterhouse filed a rule 3.853 motion for postconviction DNA testing. In the motion, Waterhouse listed the following evidentiary items to be tested for DNA:
alleged areas of blood found in [Water-house’s] motor vehicle, alleged areas of blood on [Waterhouse’s] clothing, serology evidence recovered from the victim at the autopsy, the clothing of the victim, and hair evidence.
Waterhouse asserted that the State utilized the evidence he listed for testing to *98 support its claim that Waterhouse raped and killed the victim. Waterhouse explained that DNA testing would either exonerate him of the crime or mitigate his sentence as follows:
The Defendant is innocent. The DNA testing requested by this motion will exonerate the Defendant of the crimes for which he was sentenced. The State’s case was based largely on circumstantial evidence. A major component of the State’s circumstantial evidence was the above-described Exhibits and the testimony related thereto. Without this evidence the Defendant would have been exonerated. DNA testing of these items would negate the evidentiary value of these items for the State, and would establish affirmative evidence that the Defendant is innocent. The results of the DNA testing of this physical evidence would be admissible at trial. The nature of this evidence is such that there is no question that the evidence containing the tested DNA is authentic and would be admissible at a future hearing.
On October 15, 2003, the State responded that “the exhibits that Defendant Water-house wishes to test are no longer in the possession of the Clerk of Court, having been destroyed in 1988.” The State described how the evidence was prematurely destroyed:
As best the State can reconstruct the events, the Clerk of Court submitted an order to Judge Robert Beach in 1983 that authorized destruction of evidence held by the Clerk for a large number of criminal cases. The cases were identified in [sic] by case number in an appended list of approximately forty pages. The actual order signed by Judge Beach did not refer to case number 80-192 and did not authorize destruction of the evidence introduced in the Waterhouse case. Destruction of evidence on the list apparently began in 1986 and continued through at least 1988. The Clerk’s office employees handling the destruction apparently worked from an earlier list or draft of the order which differed from the final version and which included the Waterhouse case number even though it was a death penalty case and had still been pending appeal at the time of Judge Beach’s order. As a result the Clerk’s office erroneously destroyed the Waterhouse evidence in 1988.
(Footnote omitted.)[7] The State Attorney for the Sixth Judicial Circuit added that he was “confident that the State Attorney’s Office would never have concurred with the destruction of evidence in any capital case.” Since the evidence that Waterhouse sought to be tested had been destroyed, the State requested that the postconviction court deny the motion for postconviction DNA testing.
On May 5, 2004, Sixth Judicial Circuit Court Judge R. Timothy Peters ordered that an evidentiary hearing be held to determine the circumstances surrounding the destruction of the evidence. In this order, Judge Peters stated that Water-house’s rule 3.853 motion “appearfed] to be facially sufficient.” In response to a request by the State that Judge Beach — the judge who presided over Waterhouse’s trial and prior postconviction proceedings— *99 preside over the evidentiary hearing, the order entered by Judge Peters provided:
[T]his court is concerned that, given the arguments presented, Judge Beach may be a witness with respect to the facts and circumstances of the destruction of the evidence. At the least, Judge Beach should be available to either the State or the defense should they choose to call him as a witness. Therefore, Judge R. Timothy Peters ... shall preside over this hearing.[8]
After the evidentiary hearing, Judge Peters entered an order on April 19, 2005, finding that the destruction of the DNA in Waterhouse’s case was “inadvertent and not done in bad faith.” Thereafter, Water-house filed an Amended Motion for Post-Conviction DNA Testing. He requested a new trial, contending that the destruction of the biological evidence was a constitutional due process violation and also a violation of the prohibition against cruel and unusual punishment.
On June 2, 2005, Judge Beach — who at some point was reassigned to the rule 3.853 proceedings — entered an order denying Waterhouse’s amended motion. Judge Beach first found that, because the destruction of the evidence in Waterhouse’s case was inadvertent and not in bad faith, Waterhouse could not establish a due process violation under the decision of the United States Supreme Court in Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (“[UJnless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.”). Judge Beach next elected to revisit Judge Peters’ finding of the “apparent” sufficiency of Waterhouse’s rule 3.853 motion. Judge Beach found that Waterhouse’s motion was insufficient on its face:
In both motions, the Defendant states that he is innocent and that the DNA testing will exonerate him. Further, he alleges that without the “evidence the Defendant would have been exonerated.” He further alleges that DNA testing would “negate the evidentiary value of these items for the State, and would establish affirmative evidence that the Defendant is innocent.” ...
The Defendant fails to allege how this exoneration will come about, or specifically what the DNA testing evidence will show. In order for the trial court to make the required findings, the movant must demonstrate the nexus between the potential results of DNA testing on each piece of evidence and the issues in the case. Waterhouse has failed to demonstrate or even allege such a nexus.
Judge Beach relied upon this Court’s decision in Hitchcock v. State, 866 So.2d 23 (Fla.2004), in which this Court affirmed the denial of a rule 3.853 motion for post-conviction DNA testing where the defendant failed to “explain, with reference to specific facts about the crime and the items he wished to have tested, ‘how the DNA testing requested by the motion will exonerate the movant of the crime for which the movant was sentenced, or ... will mitigate the sentence received by the movant for that crime.’ ” Id. at 28.
*100 The denial order next noted that under rule 3.853, relief is warranted only where there is a reasonable probability that the movant would have been acquitted or would have received a lesser sentence if the DNA evidence had been admitted at trial. Relying upon the facts of this Court’s decision in Waterhouse I, the' order concluded that “even if the possible DNA evidence were not considered, there is still sufficient evidence to support Defendant’s conviction.” That posteonviction court noted that “the things done to the victim match those for which the Defendant admitted a proclivity: violence, slapping, hitting, rage when finding a woman is menstruating, and anal intercourse.” That postconviction court also found that Waterhouse’s denial, and then subsequent admission, of knowing the victim were indicative of guilt, as were the facts that Waterhouse was seen leaving the lounge with the victim and that Waterhouse had “scratches on his face the day after her violent rape and murder.” The postcon-viction court at that time found that although the evidence was circumstantial, “in the context of the trial, and based on the demeanor of the witnesses, it is sufficient to support a conviction.”
Finally, to the extent that Waterhouse claimed that the blood splattered around his car did not belong to the victim, the former postconviction court concluded that even if DNA testing had proved the assertion, “this would not exonerate Defendant.”
On appeal, Waterhouse claimed that “[t]he trial court erred in denying [Water-house’s] request for relief ... where the destruction of biological evidence violated the due process rights of Mr. Waterhouse under both the United States Constitution and the Florida Constitution.” In his initial brief, Waterhouse not only contended that this Court should adopt an exception to the “bad faith” requirement in Young-blood, but also asserted that heightened safeguards should be applicable to capital proceedings. This Court ultimately issued an order that affirmed the former postcon-viction court’s denial of Waterhouse’s rule 3.853 motion for DNA testing. See Waterhouse v. State, No. SC05-1404 (Fla. Oct. 13, 2006) (unpublished order) (942 So.2d 414). The order relied upon our prior decision in Hitchcock.
While the reference to Hitchcock indicates that the former postconviction court’s denial was affirmed solely on the basis of facial insufficiency, we have comprehensively reviewed the file in the rule 3.853 appeal filed by Waterhouse. Our review demonstrates that Waterhouse’s due process challenge to the destruction of evidence in his case was previously fully presented, considered, and rejected by both the former postconviction court and this Court. Accordingly, Waterhouse’s current claim is both procedurally barred and successive. See generally Hunter v. State, 29 So.3d 256, 267 (Fla.2008) (“Claims raised in prior postconviction proceedings cannot be relitigated in a subsequent postconviction motion unless the movant can demonstrate that the grounds for relief were not known and could not have been known at the time of the earlier proceeding.”).
Further, as previously noted, in his prior rule 3.853 proceeding, Waterhouse asserted constitutional due process and Eighth Amendment challenges to the destruction of evidence in his capital case. There is no reason that he could not have asked the postconviction court at that time and in that proceeding to recognize a bar to execution on these bases.[9] Therefore, *101 to the extent Waterhouse is attempting to simply argue a variant of this earlier claim in the instant proceeding, it is also untimely. See Peterka v. State, No. SC08-1413, order at 2, 15 So.3d 581 (Fla. May 22, 2009) (unpublished order) (denying successive rule 3.851 motion as untimely where the defendant raised “a variant on a claim that he has already raised in prior proceedings by relying upon evidence that has been known since his trial”).
In light of the foregoing, we affirm the postconviction court’s summary denial of Waterhouse’s destruction of evidence claim.

The Sotolongo Affidavit Claim

Newly Discovered Evidence
To obtain relief on the basis of newly discovered evidence, a defendant is required to demonstrate that “(1) the asserted evidence [was] unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence; and (2) the newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial.” Wyatt v. State, 71 So.3d 86, 99 (Fla.2011) (citing Jones v. State, 709 So.2d 512, 521 (Fla.1998)). Newly discovered evidence satisfies the second prong of the test articulated in Jones, and reaffirmed in Wyatt, if it “weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.” Jones, 709 So.2d at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996)). We discussed the parameters for evaluating the prejudice prong of a newly discovered evidence claim in Marek v. State, 14 So.3d 985 (Fla.2009), as follows:
In determining whether the evidence compels a new trial, the postconviction court must “consider all newly discovered evidence which would be admissible” and must “evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.” [Jones v. State, 591 So.2d 911, 916 (Fla.1991).] This determination includes
whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Marek, 14 So.3d at 990 (quoting Jones, 709 So.2d at 521).
This Court has explained that “[w]hen the trial court rules on a newly discovered evidence claim after an evidentiary hearing, we accept the trial court’s findings on questions of fact, the credibility of witnesses, and the weight of the evidence if based upon competent, substantial evidence.” Hitchcock v. State, 991 So.2d 337, 349 (Fla.2008).
In the instant proceeding, the State challenges the postconviction court’s determination that Waterhouse satisfied the due diligence prong of a newly discovered evidence claim and, therefore, his second claim is untimely for purposes of rule 3.851(d)(2)(A). Conversely, Waterhouse agrees with the postconviction court’s determination that due diligence was estab *102 lished, but challenges the court’s holding that the information provided by Sotolongo was not of such a nature that it would probably produce an acquittal on retrial. We address each of these challenges.
Due Diligence
The postconviction court first found that Waterhouse had established that neither he, his counsel, nor the trial court could have known of the evidence provided in Sotolongo’s affidavit because Detective Hitchcox’s report stated that Sotolongo “does not remember when [Waterhouse] left or when the vic[tim] left as this is not the type of thing he keeps track of.” The postconviction court here relied on this Court’s decision in Mungin v. State, 79 So.3d 726, 738 (Fla.2011), for the conclusion that “due diligence surely does not require that counsel allocate limited pretrial resources in investigating a witness that is reported by police to have said something contrary to what the witness now claims.”
In Mungin, a capital defendant filed a successive motion for postconviction relief, contending that a newly discovered witness impeached the testimony of a State witness (Ronald Kirkland) who, during trial, “identified Mungin as leaving the crime scene immediately after the murder.” Id. at 729. The newly discovered witness, George Brown, testified that he, not Kirkland, was the first person on scene after the murder, and that the homicide report prepared after the murder was “false.” See id. Mungin also offered an affidavit from his trial counsel explaining why counsel did not discover this information before:
5. Prior to trial, the State provided me with a copy of Detective Gilbreath’s homicide report, in which there is brief mention made of George Brown and the information he supposedly told Detective Conn when he was interviewed on the day Ms. Woods was shot. I relied on this police report as being an accurate and truthful account of what Mr. Brown told the police. The version of Mr. Brown’s statement contained in the homicide report generally supported the version of facts provided by Mr. Kirkland, and provided no suggestion that Mr. Brown had information that would be useful to impeach Mr. Kirkland’s version of the events.
7. [sic] Because the information contained in the police report appeared to be of much less importance than the information provided by Kirkland, and due to the fact that Kirkland became the chief prosecution identification witness, our efforts focused on attempting to undermine Kirkland’s testimony at trial. Because I relied on the veracity of the police report, apparently no one from the defense team contacted or spoke with Mr. Brown prior to trial.
8. ... Had the State provided me with an accurate report containing the true version of events that Mr. Brown witnessed, this would have made a tremendous difference in terms of the presentation of Mr. Mungin’s case. Every effort would have been made to interview Mr. Brown and to present his conflicting testimony, given that it contradicts and impeaches Kirkland’s version of events and his identification of Anthony Mungin.
Id. at 732-33 (emphasis supplied). Mun-gin asserted that the newly discovered evidence from Brown demonstrated that the State violated both Brady and Giglio. See id. at 729. The postconviction court there denied Mungin’s motion without an eviden-tiary hearing, concluding that Mungin had failed to establish prejudice. See id. at 736-37. On appeal, this Court reversed and remanded for an evidentiary hearing with regard to Brown’s claim that the police report was false. See id. at 737-38.[10] Rel *103 evant to the instant proceeding, we stated that we were “troubled by the possibility that a false police report was submitted and then relied on by defense counsel.” Id. at 737 (emphasis supplied).
The State contends on cross-appeal that the fact that Leglio Sotolongo’s name was mentioned in the police report placed collateral counsel on notice that Sotolongo was a potential witness — even though the police report stated that Sotolongo did not know when Waterhouse or the victim left the ABC lounge. It is undisputed that Waterhouse’s trial counsel, and all subsequent counsel, possessed the January 7, 1980, report prepared by Detective Hitch-cox which mentioned Sotolongo. The State contends that Waterhouse has failed to carry his burden to demonstrate why, after more than thirty years, neither he nor his counsel could have not easily discovered the witness now being presented.
In Mungin, we expressed concern with the fact that defense' counsel may have relied upon a false report. See id. at 737. In Mungin, we did not state that defense counsel, or collateral counsel, upon receiving a police report, must presume that the report is false and thereafter independently verify every detail of the report or every statement made by a witness to the police. To place the onus of verifying every aspect of an unambiguous police report on defense or collateral counsel would not only create a substantial amount of work in a capital case, but also could be viewed as downplaying the seriousness of allegedly false police reports. Moreover, to hold that collateral counsel must investigate every aspect of a police report — even where it appears that such investigation would be fruitless — is inconsistent with a prior case where we held, in the context of an alleged Brady violation, that due diligence by trial counsel was satisfied even though the witness who -provided the impeaching evidence had been named in a police document that was provided to defense counsel.
In a similar manner, in State v. Huggins, 788 So.2d 238, 243 (Fla.2001), during discovery, defense counsel was provided with hundreds of “lead sheets” from the police, including one regarding a potential witness named Ausley. However, the information provided in that lead sheet was inaccurate and did not provide defense counsel with any indication that Ausley had information that was useful to the defense. See id. For this reason, defense counsel did not interview Ausley. See id. Prior to trial, Ausley gave a second statement to the prosecution which accurately depicted the information that he possessed. See id. at 241-42. The prosecutor concluded that this information “did, not support what -he believed the defense’s theory of the case would be” and did not reveal this information to the defense. Id. at 242. After the defendant was convicted of murder, Ausley approached defense counsel and informed them of the exculpatory information that he possessed. See id. at 242.
In evaluating the Brady claim in that case, the trial court found that the defendant could not have possessed the suppressed information with the use of due diligence. See id. at 243. On appeal, this Court affirmed these findings, holding that there was competent, substantial evidence to support the lower tribunal’s determination that the State had suppressed favorable evidence which was unavailable to the defendant. See id. We reached this conclusion despite the State’s assertion that *104 the information was not suppressed because the State had “disclosed lead sheet 302 and if defense counsel had interviewed Ausley prior to the trial, they would have learned the substance of Ausle/s tape-recorded statement.” Id. Relevant to this case, in Huggins, this Court noted that defense counsel only became aware of Aus-ley’s evidence when Ausley contacted the defense. See id. at 242. Thus, defense counsel in Huggins was not required to investigate hundreds of leads provided by the police — including leads which “did not reveal that further investigation would produce useful results” — in order to satisfy due diligence. Id. at 243.
The issue presented by the State’s cross-appeal is whether the analysis applicable to defense counsel in Huggins should apply to collateral counsel. Essentially, we must determine whether collateral counsel should be held to a different, higher standard of investigation than original trial counsel. Having considered the assertions of the State and Waterhouse, we conclude that collateral counsel should not be held to a higher standard. While pretrial resources are unquestionably limited, collateral counsel’s resources are also not unlimited. Thus, requiring collateral counsel to verify every detail and contact every witness in a police report — even where the police report indicates that the witness has no useful information — would place an equally onerous burden on collateral counsel, with little chance of discovering helpful or useful information.[11]
In light of the foregoing, we hold that the “due diligence” prong of a newly discovered evidence claim is satisfied when:
1. A witness swears in an affidavit that he or she spoke with the police about the crime, but the information ultimately included in the police report is either inaccurate or false; and
2. The defendant’s counsel swears that he or she relied upon the veracity of that police report and did not contact that witness because the report indicated that the witness would not have any pertinent information about the crime.
Here, the police report by Detective Hitch-cox indicated that Sotolongo did not possess any information that was favorable to the defense. Neither trial counsel nor collateral counsel interviewed Sotolongo because they relied upon the veracity of this report. In light of these facts and the decision in Huggins, we conclude that Wa-terhouse has established the due diligence prong of his newly discovered evidence claim. We further conclude that Water-house’s second claim is properly raised under rule 3.851(d)(2)(A). Accordingly, we reject the State’s cross-appeal.
Likelihood of an Acquittal on Retrial
Although Waterhouse may have satisfied the first prong of a newly discovered evidence claim, Waterhouse cannot demonstrate that Sotolongo’s testimony is of such a nature that it probably would produce an acquittal on retrial. See Wyatt, 71 So.3d at 99. First, the postcon-viction court found that, due to the passage of time, Sotolongo’s testimony during the evidentiary hearing was not reliable. This Court must accept the postconviction court’s determination with regard to the *105 credibility of Sotolongo as a witness, provided that the determination is based upon competent, substantial evidence. See Hitchcock, 991 So.2d at 349.
The transcript of the evidentiary hearing reveals that Sotolongo was uncertain during much of his testimony. For example, in his affidavit, Sotolongo states that Waterhouse repaid him on the night of the murder, but in cross-examination during the evidentiary hearing, he said that he could not be absolutely certain that Water-house repaid him on that night. Sotolongo also could not remember if he was working on the night of the murder. Sotolongo admitted that his memory was better thirty-two years ago than it is now, and that the events in question occurred “a long time ago.” Finally, Sotolongo testified that the statements in his affidavit are true “as far as [he] can recall.” Given Sotolon-go’s equivocal responses during the evi-dentiary hearing, and the sheer passage of time since the relevant events occurred, we conclude that competent, substantial evidence supports the postconviction court’s finding that Sotolongo’s testimony was not reliable.
Second, we agree with the postconviction court that Sotolongo’s testimony is not “of such a nature that it would probably produce an acquittal on retrial.” Wyatt, 71 So.3d at 99. The postconviction court’s January 20, 2012, denial order comprehensively details the significant evidence presented during the 1980 trial that supports Waterhouse’s guilt of the murder.[12] It is true that Sotolongo’s statement would have corroborated the testimony of bouncer Leon Vasquez, who testified during trial that he saw Waterhouse leave the bar with two men, and arguably impeached the testimony of bartender Ginn, who testified that she saw the victim leave with Water-house. However, in light of the other compelling evidence of Waterhouse’s guilt, the fact that a second person saw Water-house leave the bar with two men would be insufficient to produce an acquittal on retrial.
Moreover, although the denial order provides that “Vasquez’s testimony was contrary to Ginn’s testimony and it was the jury’s function to weigh the credibility of these witnesses in accepting or rejecting the testimony relied upon in reaching a verdict,” it is arguable whether the testimony of these two individuals is, in fact, inconsistent. A review of the trial record from Waterhouse’s guilt phase produces a timeline of events on the night of the murder based upon the testimony with regard to approximate times presented by both Ginn and Vasquez. In this timeline, the testimony can be interpreted to be consistent with Waterhouse being seen by both Vasquez and Sotolongo departing the ABC lounge with two men, with a time in the record being approximately 11:50 p.m., to complete a drug purchase. During trial, Vasquez testified that after leaving with two men for approximately forty-five minutes, Waterhouse was observed returning to the parking lot of the ABC lounge. Vasquez stated that the man who sold Waterhouse the drugs exited the car and *106 re-entered the lounge. Thus, the evidence is uncontroverted that after Waterhouse departed from the ABC lounge with the two males, he returned to the lounge parking lot later that same night. Waterhouse was in the vicinity of the ABC lounge parking lot at approximately 12:30 a.m., and he re-entered the lounge, although unseen by Vasquez (as there was more than one entrance to the lounge), because he was actually observed by bartender Ginn inside the lounge drinking with the victim before they departed together at approximately 1:00 a.m. Vasquez testified that he also saw the victim in the lounge after 1:00 a.m., but he did not know if she left with Waterhouse because he did not see the victim leave the bar.
In light of the foregoing, we conclude that even if Sotolongo had told Detective Hitchcox that he saw Waterhouse leave the ABC lounge with two men on January 2, 1980, this testimony would add nothing to that which was already presented during trial. Vasquez already presented these facts, and actually set forth a more precise timeline than Sotolongo. Not only did Vasquez testify that he saw Water-house leave the lounge with two males at 11:50 p.m., he also observed Waterhouse in the parking lot of the lounge around 12:30 a.m. Because Sotolongo did not see the victim leave the ABC lounge, his testimony during the evidentiary hearing does not undermine an analysis that Waterhouse returned to the lounge after his initial departure, and then later left with the victim.
Waterhouse has failed to establish that Sotolongo’s testimony is of such a nature that it would probably produce an acquittal on retrial. See Wyatt, 71 So.3d at 99. Accordingly, we affirm the postconviction court’s denial of relief based upon Water-house’s claim of newly discovered evidence.
Brady Claim
Waterhouse next claims that the State violated Brady by failing to disclose Sotolongo’s testimony to defense counsel. A Brady violation occurs when “(1) . favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.” Taylor v. State, 62 So.3d 1101, 1114 (Fla.2011). This Court has expressed the standard of review of a Brady claim denial as follows:
Brady claims present mixed questions of law and fact. See Sochor v. State, 883 So.2d 766, 785 (Fla.2004). Thus, as to findings of fact, we will defer to the lower court’s findings if they are supported by competent, substantial evidence. See id. “[T]his Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.” Hurst [v. State, 18 So.3d 975, 988 (Fla.2009)] (quoting Lowe v. State, 2 So.3d 21, 30 (Fla.2008)). We review the trial court’s application of the law to the facts de novo.
Franqui v. State, 59 So.3d 82, 102 (Fla.2011).
In rejecting this claim, the postconviction court noted that it was faced with the conflicting testimonies of Sotolongo and Detective Hitchcox. The court ultimately found Detective Hitchcox’s testimony with regard to the interview to be more reliable than that of Sotolongo because “it was reduced to writing” at the time of the 1980 interview. Further, the court found that the passage of time and Sotolongo’s “weak recollection militate against the reliability of [his] statements.” Because the postcon-viction court concluded that Hitchcox’s depiction of the interview was accurate, it *107 held that no favorable evidence was suppressed by the State.
Waterhouse has not established that a Brady violation occurred. As with the newly discovered evidence claim, the postconviction court heard the testimony of Sotolongo, and concluded that Detective Hitchcox’s testimony with regard to the 1980 interview was more reliable. Given the passage of time and Sotolongo’s admission that his memory of the interview was better thirty-two years ago than it was on January 17, 2012, we conclude that the postconviction court’s finding is supported by competent, substantial evidence. See Franqui, 59 So.3d at 102 (stating that this Court will not substitute its judgment for that of the postconviction court on issues of witness credibility). Thus, if the interview occurred as reflected in the report, and as testified to by Detective Hitchcox, then the State did not suppress impeaching evidence because the report was not false.
Moreover, even if this Court were to reject the postconviction court’s determination of witness credibility, and conclude that the State suppressed impeaching evidence because Detective Hitchcox’s report is false (which we do not), Waterhouse’s claim would nonetheless fail because he cannot establish prejudice under Brady. In Brady v. Maryland, the United States Supreme Court held that the suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment. See 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court has explained that to establish prejudice under the materiality prong of Brady, a defendant must demonstrate
“a reasonable probability” that the result of the trial would have been different if the suppressed documents had been disclosed to the defense. As we stressed in Kyles [v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)]: “[T]he adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” 514 U.S. at 434 [115 S.Ct. 1555].
... [T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury’s conclusions. Id. at 434-435 [83 S.Ct. 1194], Rather, the question is whether “the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Id. at 435 [83 S.Ct. 1194].
Strickler v. Greene, 527 U.S. 263, 289-90, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Rodriguez v. State, 39 So.3d 275, 288 (Fla.2010) (holding that defendant “failed to show prejudice — i.e., that ‘the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.’ ” (quoting Strickler, 527 U.S. at 290, 119 S.Ct. 1936)).
First, as previously discussed in the analysis of the newly discovered evidence claim, the testimony of Sotolongo, Vasquez, and Ginn are not necessarily inconsistent and can be reconciled. Sotolongo’s testimony is not, therefore, actually impeaching. Second, even if Sotolongo’s testimony could be viewed as impeaching, in light of Waterhouse’s incriminating statements and the other evidence of his guilt, this cumulative testimony cannot “reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Strickler, 527 U.S. *108 at 290, 119 S.Ct. 1936 (quoting Kyles, 514 U.S. at 435, 115 S.Ct, 1555); see Rodriguez, 39 So.3d at 288. Accordingly, Soto-longo’s testimony fails the materiality and prejudice prong of Brady, and we conclude that the claim presented by Waterhouse is without merit.
CONCLUSION
In accordance with our analysis above, we affirm the circuit court’s denial of post-conviction relief. Further, we reject the State’s cross-appeal and affirm the determination of the postconviction court that Waterhouse’s second claim satisfied the due diligence component of Florida Rule of Criminal Procedure 3.851(d)(2)(A). No motion for rehearing will be entertained by this Court. The mandate shall issue immediately. Waterhouse’s request for a stay of execution is denied.
It is so ordered.
PARIENTE, LEWIS, POLSTON, LABARGA, and PERRY, JJ., concur.
CANADY, C.J., concurs in result with respect to the affirmance of the trial court’s order denying relief to Waterhouse, but dissents with respect to the decision on the State’s cross-appeal.
QUINCE, J., recused.

. Section 43.195, Florida Statutes (1987), provided: "The clerk of any circuit court or county court may dispose of items of physical evidence which have been held as exhibits in excess of 10 years in cases on which no appeal is pending or can be made.” In 1989, the statute was amended to allow for destruction of such evidence after three years. See ch. 89-176, § 2, Laws of Fla. In 2003, this *90 statute was renumbered as section 28.213. See ch.2003-402, § 26, Laws of Fla.

. In Mungin, a witness came forward and asserted that "he was the first person on the scene after the murder and that no other person was present in the store. He states that he told this to police the night of the murder and that the police report is false.” Id. at 729 (emphasis supplied).

. He also denied the alleged altercation at Murphy's Bar, stating that it “[n]ever happened.”

. The postconviction court also found that Waterhouse's second claim was properly pled under rule 3.851.

. According to Waterhouse I, "[t]he victim's wounds were such that they were probably made with a hard instrument such as a steel tire changing tool.” 429 So.2d at 303.

. Neither party disputes that this claim was not filed pursuant to subdivision (C).

. Contrary to Waterhouse's assertion in his successive postconviction motion, "all” of the evidence from trial was not destroyed. For example, fingernail clippings from the victim were preserved. However, DNA testing on the clippings from one hand failed to disclose any pertinent facts, and testing on the clippings from the other hand only indicated female DNA. However, all of the exhibits listed by Waterhouse in his motion for postconviction DNA testing had been destroyed.

8. On June 3, 2004, the State filed a petition with this Court seeking review of Judge Peters’ non-final order. See State v. Waterhouse, No. SC04-956 (Fla. petition filed June 3, 2004). The State requested that the Court reverse the order mandating an evidentiary hearing on the circumstances surrounding the destruction of the evidence and finding the motion for DNA testing to be facially sufficient. On November 3, 2004, this Court dismissed the State's petition without prejudice. See State v. Waterhouse, 888 So.2d 623 (Fla.2004) (table decision).

. Waterhouse presents no authority to support the proposition that such a challenge is *101 not ripe until a warrant is signed. Cf. Barnhill v. State, 971 So.2d 106, 118 (Fla.2007) ("Barnhill concedes that his claim involving competency to be executed is not ripe for review as he has not yet been found incompetent and a death warrant has not been signed.”).

. However, we rejected a newly discovered evidence claim, holding that Mungin could not demonstrate that the information provided by Brown was of such a nature that it would probably produce an acquittal on retrial. See id. at 738.

. Arguably, cases in which a witness comes forward years after a defendant is convicted of capital murder and contends that the police provided false information in a document are not common, and should not be deemed the norm in capital murder investigations. Instead, as asserted by Waterhouse, attorneys and judges should be able to rely upon the veracity of a police report.

. Contrary to Waterhouse’s assertion, the significance of the newly discovered evidence is not to be considered in conjunction with evidence that might be presented at a future, speculative retrial. Instead, as we noted in Marek:
In determining whether newly discovered evidence would probably result in an acquittal or a lesser sentence, the new evidence must be viewed in conjunction with the evidence presented at trial. Thus, the Court evaluates all the admissible newly discovered evidence, including any admissible newly discovered evidence presented in prior postconviction proceedings, and compares it with the evidence that was introduced at trial.
14 So.3d at 990-91 (emphasis supplied).