788 So.2d 238 (2001)
STATE of Florida, Appellant,
v.
John Steven HUGGINS, Appellee.
No. SC96216.
Supreme Court of Florida.
June 7, 2001.
*239 Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, FL, for Appellant.
*240 Robert Wesley, Public Defender, Ninth Judicial Circuit, and Tyrone A. King, Co-Counsel, Orlando, FL, for Appellee.
PER CURIAM.
We have for review an order from the trial court vacating the death sentence of John Steven Huggins and granting a new trial based on the court's findings that the State violated the dictates of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For reasons expressed below, we affirm.

I. FACTS
John Steven Huggins was convicted of first-degree murder, carjacking, kidnaping, and robbery. The victim, Carla Larson, worked in Orlando as an engineer for Centex Rooney. On June 10, 1997, Larson left work in her white Ford Explorer to buy refreshments at a nearby Publix and never returned. Her coworkers instituted a search and were told by eyewitnesses that on the afternoon of Larson's disappearance, they observed a white Ford Explorer speeding dangerously on a dirt road near where the body was eventually found two days later. The driver was described as a white male with dark hair and a dark tan.
On the day of Larson's disappearance, John Huggins and his wife, Angel, were visiting Orlando with their children. Angel testified that although she and Huggins drove to Orlando together, she left Orlando without him. Later that same day, Huggins arrived at Angel's mother's house in Melbourne driving a white truck that matched the general description of the victim's. Neighbors corroborated the fact that a white sports utility vehicle was seen at Angel's mother's residence. Although Huggins and Angel were in the process of a divorce, Angel stayed with Huggins in various hotels in and around Melbourne until Angel's sister, Tammy, arrived in Melbourne to visit. During Tammy's stay, Huggins and Tammy began a relationship.
Kevin Smith, a friend of Huggins, testified that during this time he agreed to let Huggins park a white sports utility vehicle at his house for a few days. Kevin noticed the truck had a radar detector hard wired in it, but after the truck was picked up, he discovered the radar detector hidden in a box near his hot water heater. On the evening of June 26, 1997, the police received a call that a truck was burning on a vacant lot near Kevin's house. When they arrived at the scene, the truck was engulfed in flames. An investigation revealed that the burned-out truck was the victim's Ford Explorer and the fire had been intentionally set.
Tammy returned home to Maryland on June 27, 1997, with Huggins accompanying her. Shortly after Huggins and Tammy left Florida together, Angel saw a television program, America's Most Wanted, which featured Carla Larson's murder. Angel called and reported that she suspected her husband of the murder. As a result of Angel's call, police conducted two extensive searches of Angel's mother's house and a shed on the property, but were unable to find incriminating evidence. Angel and her mother, Fay, also searched the home on their own. While retrieving bug spray from her shed, Fay noticed a screwdriver on top of a box. On a whim, she unscrewed the lid from an electrical box in the shed and found the victim's jewelry secreted inside the box. No fingerprints were recovered from the jewelry, the electrical box, or its cover.
Police also questioned Kevin, who eventually admitted that he had found the radar detector, wiped any fingerprints off, and threw it in some bushes near his house. Police found the detector and discovered that it had belonged to the victim.
*241 Huggins was arrested in Maryland for the crime. After he was indicted by a grand jury in Orange County, Huggins moved for a change in venue. The trial court granted this request and transferred venue to Duval County. On February 3, 1999, Huggins was convicted of first-degree murder, carjacking, robbery, and kidnaping. The jury recommended the death sentence by a vote of eight to four. After considering the proven aggravators and mitigators, the trial court sentenced Huggins to death.
Within weeks after the case was concluded, Preston Ausley, an engineer who worked at the Orange County Courthouse, contacted defense counsel and informed them of information which the State knew but never disclosed. On March 25, 1999, before this Court reviewed the merits of the direct appeal, defense counsel filed a petition for a writ of habeas corpus in the trial court, alleging that the State withheld favorable information in violation of Brady. In light of the pending petition, this Court relinquished jurisdiction of the direct appeal so that the trial court could conduct an evidentiary hearing on the habeas corpus petition.[1] After the evidentiary hearing was concluded, the trial court entered a written order finding as follows:
On June 16, 1997, an individual named Preston Ausley spoke with Detective Daniel Nazarchuk of the Orange County Sheriff's Office. Mr. Ausley had contacted the Sheriff's office with information regarding the Carla Larson case. Mr. Ausley told Detective Nazarchuk that a white Explorer cut him off in traffic [in Orlando] and that he had written down the tag number. Mr. Ausley told Detective Nazarchuk that he had verified within one digit that the license plate number he had recorded was the same as that of Carla Larson's Explorer. As a result of this conversation, lead sheet 302 was created from Detective Nazarchuk's notes. The lead sheet was provided to the defense during discovery.
At the evidentiary hearing, Mr. Ausley claimed that he told Detective Nazarchuk that the individual he saw driving the vehicle was a white female in her late twenties to early thirties with blonde hair just below the shoulder. However, Detective Nazarchuk's notes indicate that Mr. Ausley said he saw a white male of the same description driving the vehicle. Detective Nazarchuk recorded the date of the sighting as June 12, 1997. However, Mr. Ausley believes it was June 11, 1997. At the hearing, Mr. Ausley explained that he is very bad with dates and came to the conclusion that he encountered Ms. Larson's truck on June 11, 1997, by verifying the date through other sources.
Thereafter, on February 1, 1999, the day after seeing Angel Huggins on television during coverage of Defendant's trial, Preston Ausley went to the Office of the State Attorney to speak with the State Attorney for the Ninth Judicial Circuit, Lawson Lamar. Mr. Lamar was unavailable. Mr. Ausley was directed to Assistant State Attorney Dorothy Sedgwick who spoke with him briefly. Ms. Sedgwick asked Pat Guice, an Investigator with the State Attorney's office, to speak with Mr. Ausley and take a tape recorded statement.
In the recorded statement provided to Mr. Guice, Mr. Ausley stated that when he saw Angel Huggins on television it struck him that she resembled the white female with blonde hair he had seen driving the white truck with a license *242 plate that matched Carla Larson's within one digit on the morning of June 11, 1997, on International Drive. After he had given his statement, Mr. Guice requested that Mr. Ausley return the next day so that the attorneys, who were at that very time prosecuting Defendant's case in Jacksonville, could speak with him.
The next morning, Assistant State Attorney Jeff Ashton, who was then prosecuting Defendant's case in Jacksonville, spoke with Mr. Ausley via telephone. After his conversation with Mr. Ausley, Mr. Ashton determined that Mr. Ausley's name had been given to Defendant in lead sheet 302, Mr. Ausley's statement did not support what he believed the defense's theory of the case would be, and Mr. Ausley's statement was of little value. Mr. Ashton decided not to disclose the tape recorded statement or the information contained therein to Defendant. Mr. Ashton attended trial that day and did not disclose the fact that he had been contacted by Mr. Ausley to the Court or to the defense counsel. The trial concluded that same week.
At some point after Defendant's trial and sentencing, Mr. Ausley contacted Tyrone King, co-counsel for Defendant. Mr. Ausley advised Mr. King of his meeting with the members of the State Attorney's Office and the substance of his February 1, 1999, tape recorded statement.
In a detailed written order, the trial court found that the State violated the dictates of Brady and granted Huggins a new trial. The State appeals this ruling, contending that there is insufficient evidence to support the trial court's ruling.

II. BRADY VIOLATION
The Fifth and Fourteenth Amendments to the United States Constitution require the State to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A defendant must prove three elements in order to establish a Brady violation:
[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.
Way v. State, 760 So.2d 903, 910 (Fla.2000) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)), cert. denied, ___ U.S. ___, 121 S.Ct. 1104, 148 L.Ed.2d 975 (2001).
In reviewing a trial court's evaluation of the evidence, this Court will not "substitute its view of the facts for that of the trial judge when competent evidence exists to support the trial judge's conclusion." Jones v. State, 709 So.2d 512, 514-15 (Fla.1998). However, legal questions must be reviewed independently to "ensure that the law is applied uniformly in decisions based on similar facts." Stephens v. State, 748 So.2d 1028, 1034 (Fla. 1999).
In its order, the trial court first found that the government possessed evidence favorable to the defendant:
In this case, Mr. Ausley's statement may have been used to impeach a key State witness, Angel Huggins. Ms. Huggins' testimony was a crucial part of the State's case against Defendant. Mr. Ausley's statement clearly conflicts with Ms. Huggins' testimony at trial. Not only is there conflict, but Mr. Ausley's statement also reflects upon Ms. Huggins' credibility.
*243 Our review of the record shows that Angel's testimony included several statements that could conflict with Ausley's statement. She initially told police that she saw Huggins with the truck on June 10 only. She later amended this statement and declared that she also saw the truck on June 11 and June 12, but had forgotten because "it was a very stressful period of time and there was a lot of things I could not remember." Angel insisted that she did not ride or get into the truck. Had the jury been presented with Ausley's statement that he saw a woman resembling Angel driving a white Ford Explorer with a tag number similar to that of Larson's missing truck, Angel's testimony concerning the truck could have been severely undermined. Accordingly, we conclude that competent substantial evidence supports the trial court's finding that the statement constitutes favorable evidence.
Second, the trial court found that the State suppressed favorable evidence and that this was evidence which the defendant did not and could not have possessed with reasonable diligence:
Here, Mr. Ashton decided that the State did not need to disclose Mr. Ausley's statement to the defense because Mr. Ausley's name had been given to the defense as part of lead sheet 302 and because he believed Mr. Ausley's statement was not credible or material.
The State asserts that it did not suppress the information. The State contends that it disclosed lead sheet 302 and if defense counsel had interviewed Ausley prior to the trial, they would have learned the substance of Ausley's tape-recorded statement.
As the trial court noted, defense counsel was provided with hundreds of lead sheets, which defense counsel reviewed and found to be of little significance. Lead sheet 302 was included in this disclosure and stated that Ausley had seen a white male with blonde hair driving a white vehicle in Orlando information which did not reveal that further investigation would produce useful results. More importantly, during Huggins' trial, Ausley made a second tape-recorded statement directly to the prosecutors, providing critical information that the driver he saw resembled Angel Huggins. This second statement significantly changed the nature of Ausley's original statement and could not have been made until Ausley saw the televised video clips of Angel, which happened during the trial. None of this information was disclosed to the defense. Based on the above, we find there is competent substantial evidence to support the trial court's finding that the State suppressed favorable evidence which was unavailable to the defendant.
Finally, the trial court analyzed all the evidence presented at trial and found that prejudice ensued as "the suppression of Mr. Ausley's statement resulted in a verdict that is not worthy of confidence." As this prong involves a mixed question of law and fact, we independently review the legal question of prejudice while giving deference to the trial court's factual findings. In reviewing the materiality of an alleged Brady violation and whether prejudice ensued, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Strickler, 527 U.S. at 289-90, 119 S.Ct. 1936. This Court must review the net effect of the suppressed evidence and determine "whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Maharaj v. State, 778 So.2d 944, 953 (Fla.2000). If the suppression of the *244 favorable evidence shakes the confidence in the verdict, the defendant is entitled to relief.
The State contests the trial court's conclusions, asserting that Ausley's statement proved only that Angel and Huggins were using the victim's truck as their family vehiclea piece of evidence which would not benefit the defense. The State also contends that the suppressed evidence would not change the outcome of the proceeding because Ausley's statement could be impeached by his original testimony to the police officer that Ausley had originally claimed to have seen a vehicle driven by a white male.[2] We disagree.
The State presented a purely circumstantial case against Huggins. As Angel was its key prosecutorial witness who established crucial details in the State's theory of the case, her credibility was critical. Ausley's statement conflicted with Angel's recollection of events and could have affected her credibility.
Ausley's statement also established a possible motive for Angel to give false testimony about the Explorer. Fay's neighbors testified that they saw a white sports utility vehicle in her driveway. Angel testified that the reason the truck was at her mother's house was because Huggins drove it there. Ausley's account, however, could support a conclusion that Angel herself possessed the truck, shedding a different light as to why a white sports utility truck was at her mother's home. It could also support a different theory on why the victim's jewelry was found at her mother's house.
Finally, Ausley's testimony could negate the allegation that the white truck Huggins possessed actually belonged to the victim. No witness testified that Huggins was driving Larson's truck, but merely that he had a truck which looked similar to the victim's white Explorer. Ausley was the only witness who wrote the tag number of the vehicle in question. Although one of the tag numbers was illegible, the remaining five numbers matched the tag number of Larson's truck. According to Ausley, this truck was in Orlando on the morning of June 11 or June 12, a position contrary to the State's theory that the victim's truck was in Melbourne with Huggins. Based upon the above factors, the Court finds that the suppressed evidence was material and that failure to disclose such evidence results in a verdict not worthy of confidence, thus entitling Huggins to a new trial.

III. CONCLUSION
Based on the foregoing, we affirm the trial court's order vacating Huggins' convictions and sentences for first-degree murder and the other crimes.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, LEWIS and QUINCE, JJ., concur.
PARIENTE, J., concurs with an opinion, in which ANSTEAD, J., concurs.
PARIENTE, J., concurring.
I concur fully in the majority opinion. The prosecutor's obligation to disclose exculpatory evidence is grounded not only in the Due Process Clause of the United States Constitution, but in the unique and critical role played by the prosecutor in our American system of justice. The United States Supreme Court enunciated these important principles in Brady v. Maryland, *245 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and in subsequent decisions the Court has consistently expanded the scope of the prosecutor's obligations. See United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The Court also has repeatedly reaffirmed that prosecutors serve a special role in criminal trials in searching for the truth and ensuring that justice prevails. See Strickler v. Greene, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
Most recently, in Strickler, the Court reemphasized the basis for the prosecutor's broad duty of disclosure:
[A prosecutor] is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."
527 U.S. at 281, 119 S.Ct. 1936 (quoting Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).
In this case, Judge Belvin Perry, Jr., an experienced trial judge and former prosecutor, recognized the important principles set forth in Brady. In his thoughtful and well-reasoned order granting a new trial because the prosecutor failed to comply with the mandatory duty of disclosure, Judge Perry concluded:
In so finding, it is not the Court's intent or wish to punish society or the family of Carla Larson. This Court has a sworn obligation to follow the law. The principles of Brady v. Maryland are well known to all lawyers who practice criminal law and remedies for its violation are well known. While a defendant's right to a fair trial is of the utmost importance in our system of justice, particularly when the ultimate punishment may be imposed, the Court is mindful of the heavy burden it places on Carla Larson's family as well as society. But in the end, society wins not only when the guilty are convicted but when criminal trials are fair.

(Emphasis supplied.) This case should serve as a salient reminder of a prosecutor's solemn obligation to ensure that each defendant charged with a crime receives a fair trialand the adverse consequences when the prosecutor fails to fulfill that obligation.
ANSTEAD, J., concurs.
NOTES
[1] As the trial court subsequently granted Huggins a new trial based on the postconviction motion, this Court dismissed his direct appeal.
[2] Ausley explicitly stated that he never described the driver as male. Such a determination is for the finder of fact.