# Supreme Court of Florida

---

No. SC18-1238

---

**JASON ANDREW SIMPSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

---

No. SC19-700

---

**JASON ANDREW SIMPSON,**
Petitioner,

vs.

**RICKY D. DIXON, etc.,**
Respondent.

January 13, 2022

PER CURIAM.

Jason Andrew Simpson, a prisoner under sentence of death, appeals the denial of numerous guilt-phase claims raised in his motion for postconviction relief filed under Florida Rule of Criminal

Procedure 3.851 and petitions this Court for a writ of habeas corpus.[1]  Because we agree with Simpson that the State committed a *Brady*[2] violation by failing to disclose that one of the witnesses was a confidential informant for the State, we reverse the denial of postconviction relief as to the guilt phase, vacate Simpson's convictions for first-degree murder, and remand to the trial court for a new trial.

## I.  BACKGROUND

Simpson was convicted in 2007 of the 1999 first-degree murders of "Big Archie" Crook,[3] a drug dealer against whom Simpson was working as a confidential informant for the Jacksonville Sheriff's Office (JSO), and Crook's pregnant girlfriend, Kimberli Kimbler.  In the years leading up to the murders of Big Archie and Kimbler, Big Archie and his son, "Little Archie," were heavily involved in the drug trade in Jacksonville.  Big Archie

---

1.  We have jurisdiction.  *See* art. V, § 3(b)(1), (9), Fla. Const.

2.  *Brady v. Maryland*, 373 U.S. 83 (1963).

3.  To distinguish between the victim, Archie Howard Crook, and his son, a witness, Archie Clyde Crook, the victim will be referred to as "Big Archie" and his son will be referred to as "Little Archie," a nickname by which he is known.

supplied drugs that Little Archie would sell. Simpson was one of their associates in the drug trade, as was George Michael Durrance. On the morning of July 16, 1999, Big Archie's father discovered the bodies of Big Archie and Kimbler in the master bedroom of the home they shared. They had been hacked to death with an axe.

Detectives with the JSO responded to the scene. There were no visible signs of forced entry to the home, and nothing was disturbed inside other than the master bedroom. Detectives learned that Little Archie and his friend, Shawn Smallwood, had visited Big Archie's house between 10 and 11 p.m. the night of July 15, 1999. They smoked marijuana, and Big Archie ate strawberry shortcake. The medical examiner estimated that, judging by the state of the food in Big Archie's stomach, he died within an hour after he ate. Little Archie testified that when he left Big Archie's home that night, he did not lock the door behind him, and Big Archie did not get up and lock it after him. Both Little Archie and Smallwood denied any involvement in the murders.

During their search of the property behind Big Archie's house, detectives located an axe believed to be the murder weapon, a pair of socks, and two pieces of torn material on a barbed wire fence.

Four days later, on July 20, 1999, a pile of clothing was found behind an air conditioning unit at a church adjacent to Big Archie's house, including a baseball cap, a black sweatshirt, black sweatpants, and a pair of tennis shoes. The torn pieces of material found on the barbed wire fence matched the color and appearance of the sweatshirt and sweatpants located on the church property. Detectives also recovered a pager located next to the victims' bed. The first number on the pager belonged to Simpson's mother, with whom Simpson was living at the time.

Evidence collected at the scene was processed by Florida Department of Law Enforcement (FDLE) and FBI analysts. Two human head hairs were recovered from Kimbler's right hand. DNA analysis excluded Kimbler, Little Archie, Simpson, Smallwood, and Durrance as sources of the first hair but not Big Archie. As to the second hair, Little Archie, Simpson, Smallwood, and Durrance were excluded as sources but not Kimbler. DNA analysis of the scrapings from Kimbler's fingernails excluded Simpson, Smallwood, and Durrance as potential donors of the material under Kimbler's fingernails, but not Little Archie or Big Archie.

DNA from five bloodstains on the sweatpants was tested. Three of the stains were mixtures, the primary profile of which matched Kimbler's DNA profile, and two from which Simpson could not be excluded as a minor contributor. The other two stains contained a single DNA profile matching that of Big Archie. The primary contributor of the DNA profile found on the waistband of the sweatpants was Simpson. Assuming the DNA profile on the waistband was a mixture of two DNA profiles, Big Archie, Little Archie, Kimbler, and Smallwood were excluded as minor contributors. Simpson was also the primary contributor of the DNA profile found on the leg cuffs of the sweatpants. The profile of the minor contributor to the leg cuffs was unable to be determined. Although there was no blood on the sweatshirt, Simpson was the primary contributor of the DNA profile found on the neck. Big Archie and Smallwood were excluded as minor contributors, but not Little Archie. A white, crusty stain on the left shoulder of the sweatshirt contained a single DNA profile matching that of Simpson.

Three hairs recovered from the packaging containing the sweatpants, sweatshirt, and baseball cap were subjected to DNA

testing. One hair contained no DNA. The other two hairs matched each other, and a partial DNA profile of those hairs matched Simpson's DNA profile. Big Archie, Little Archie, Kimbler, and Smallwood were excluded as the source of the two hairs. A DNA profile could not be obtained from the baseball cap or socks.

The State presented testimony from an expert who opined that the major profile of DNA on the clothing would be the DNA from the person who had worn the clothing most recently. But on cross-examination, the expert agreed that if one person wore clothing over an extended period of time and it was then put on by a second individual for a short period of time, he would not expect the major profile to come from the most recent wearer.

Prior to the murders, JSO Detective Robert Hinson met with Simpson on June 10, 1999, shortly after Simpson's release from jail on grand theft charges, because Simpson was willing to assist JSO with investigation of criminal activity. Detective Hinson was investigating a group of individuals, including Little Archie, Big Archie, and Durrance, concerning another homicide. On June 21, 1999, Simpson contacted Detective Hinson to tell him that he had been in contact with Little Archie, who wanted Simpson to "hit a

lick," which Simpson understood in that instance to mean that Little Archie was going to steal a car. The next time Detective Hinson spoke with Simpson was on July 16, 1999, the day Big Archie and Kimbler's bodies were discovered. When Detective Hinson heard about the murders that morning, he contacted Simpson to gather information. Detective Hinson met Simpson at Simpson's mother's house, where Simpson was staying. When Detective Hinson arrived at the house, he noticed that Simpson had a "large gash" on his finger, which Simpson claimed he injured when hitting the electrical panel in his mother's garage. When Detective Hinson told him about the murders, Simpson expressed that he was not sorry about Big Archie's death. Simpson told Detective Hinson that Big Archie and Little Archie had been putting the word out on the street that Simpson was a snitch and was cooperating with the police. Simpson said the last time he spoke with Big Archie was a couple of weeks prior when they went somewhere together to buy drugs. Simpson told Detective Hinson that Little Archie had stolen fifty pounds of marijuana from Big Archie. After speaking with Simpson, Detective Hinson notified the homicide detectives working this case that they should look further

at Simpson. Detective Hinson also told the homicide detectives what Simpson said about Little Archie stealing his father's marijuana. A few days later, Detective Hinson obtained a voluntary DNA sample from Simpson.

From July 1999 to fall 2001, detectives made little progress in the investigation of the murders. Then, in fall 2001, while awaiting trial on a charge of conspiracy to traffic in cocaine, Durrance notified JSO and the State Attorney's Office that Simpson had confessed to him in 1999 that he murdered Big Archie and Kimbler. Durrance told detectives that in the days before the murders, Simpson came to his house and told him that he was going to rob Big Archie of $10,000. Simpson also told Durrance that Big Archie offered him money to kill Durrance, but Simpson laughed it off and told Durrance he would never kill him. A few days after the murders, Simpson asked Durrance to front him some drugs or loan him some money. Assuming Simpson had robbed Big Archie as he said he intended to do, Durrance told him that he should already have money. Simpson replied, "You know, I'm the one who killed him, you know I did."

Armed with Durrance's allegation that Simpson confessed, Detective Hinson called Simpson to come to the police station to speak with detectives. When the detectives told Simpson that they needed his assistance with the "Crook/Kimbler" murders, Simpson initially said that he did not know them. Once the detectives said, "Archie Crook," Simpson stated that he knew him but looked at his watch and said, "It's time for me to go, I've got to get to work." Simpson then said, "You cannot hold me here, I do not scare easy."

A year later, in fall 2002, detectives learned that DNA matching Simpson's was found on the clothing left on the church property. Simpson was brought in for an interview. When one of the detectives told Simpson that they wanted to talk to him about the "Crook and Kimbler" murders, Simpson replied that he did not know them. When asked whether he knew "Big Archie," Simpson said he knew him "a little." Simpson told the detectives that he had information on the case and wanted to share it, but he wanted a deal in a then-pending, unrelated case. When the detectives told Simpson that they thought he committed the murders because they had his DNA at the crime scene, Simpson denied involvement and said that was impossible. When the detectives told Simpson that

they were not in a position to offer him a deal, the interview concluded.

Simpson was interviewed again the next day. Detectives advised Simpson that other people were pointing fingers at him, including Durrance. Simpson told the detectives that there was no loyalty between him and Durrance because he was the person who had initially provided the information to police that led to Durrance's arrest and ultimate conviction in the trafficking case, and he suspected Durrance was aware of that fact. Detectives showed Simpson pictures of the church and the clothes worn during the murders and told him that they had information that the clothes belonged to Simpson. Simpson was then arrested for the murders of Big Archie and Kimbler.

At trial, the defense's theory of the case was that Little Archie, Smallwood, and Durrance were all involved in the homicides. The defense argued during closing argument that Little Archie murdered Big Archie and Kimbler because he was jealous of Kimbler's unborn baby and perhaps because there were drugs and a lot of money involved. The defense further argued that Durrance lied about Simpson's confession as retribution for Simpson's cooperation with

law enforcement in the case against Durrance, and Durrance also had a motive to kill Big Archie because Big Archie had owed him money and wanted Durrance dead.

Little Archie admitted during trial that he was angry and upset that Kimbler was carrying his father's child. Little Archie had hoped that his father and mother would get back together, and he was upset that his father was living with Kimbler. Contrary to Simpson's trial testimony, Little Archie denied having gone over to Simpson's home in the days prior to the murder and denied having ever borrowed any clothing from Simpson. Little Archie testified that Simpson was "a little bigger" than he was but admitted that he could wear sweatpants and a sweatshirt that were bigger than his normal size.

Little Archie admitted that he "might have said" that Kimbler's baby would never see the light of day. He also admitted that he "could have said" that he would kill Big Archie, Kimbler, and the baby. Brenda Crook Bennett, Big Archie's sister and Little Archie's aunt, testified that she advised Detective Williams that there was a time when Little Archie said, in front of Big Archie, that he would kill Big Archie, Kimbler, and the baby if they ever had a baby.

Several other witnesses reported having heard Little Archie say that Kimbler's baby would never see the light of day.

When Detective Williams interviewed Little Archie the day the bodies were found, Little Archie was aware of the positions in which the bodies were found, which he said that he learned from his grandfather, although his grandfather denied telling him. During the interview, Little Archie seemed nervous and upset, and "jumped around somewhat on the explanations to the questions" police had asked. Little Archie told police that he had taken some medication or had forgotten to take some medication.

Simpson took the stand at his trial. Simpson testified that he was cooperating with law enforcement in 1999. After he got out of jail in 1999 in the grand theft case, Simpson rented a room in a trailer. According to Simpson, one day when he was painting his mom's house, Little Archie came over to see him. Little Archie told Simpson that he heard Simpson was working with the police but then told Simpson he was joking. Simpson asked Little Archie to drive him back to his trailer. During the ride to the trailer, Little Archie asked Simpson if he could borrow some clothes because he wanted to "hit a lick," meaning he was planning to steal a car.

Little Archie said he needed dark clothes because he did not have anywhere he was staying. When they got to the trailer, Simpson told Little Archie that he could pick some clothes out from a pile of clothes on the floor while Simpson took a shower. When Simpson got out of the shower, Little Archie was gone, but the top drawer to Simpson's dresser was open, and Lieutenant Tom Waugh's (one of the officers to whom Simpson was providing information) business card, which Simpson kept inside his dresser, was on the top of the dresser. Simpson immediately called Lieutenant Waugh to tell him about his conversation with Little Archie and then called Detective Hinson to tell him what Little Archie planned to do. Shortly after that, Simpson moved out of the trailer and in with his mother. At the time of the murders in July 1999, Simpson was living at his mother's house.

Simpson testified that on the morning of July 16, 1999, the power went out at his mother's house. He scratched his finger trying to turn the power back on at the breaker box in his mother's garage. Simpson could not recall if he called the Jacksonville Electric Authority (JEA) that morning or not but recalled that the power came back on quickly, and he went back to sleep. Sometime

later, Simpson's mother woke him up, tossed him the phone, and told him Detective Hinson had called.  When Simpson met with Detective Hinson later that day, he did not bother to put a bandage on the scratch on his finger.  When Detective Hinson told him that Big Archie and Kimbler were dead, it took a while for him to process the news.

Simpson testified that he did not, and had no reason to, murder Big Archie or Kimbler.  When asked about the clothing with the victims' blood and his DNA on it, Simpson stated that Little Archie had taken that clothing from his trailer.  Simpson identified the articles of clothing in court as belonging to him.  With respect to the initial interview with the detectives in 2001, Simpson stated that the detectives were rude and had left him in the room by himself for a while.  When Simpson was leaving the police station that day, he told the detectives that he had to leave to go to work.  Simpson denied that he told detectives he did not know Big Archie and Kimbler.  Simpson stated that he misunderstood and thought the detective asked him if he knew "Crews."  Simpson was confused, but when the detective then mentioned "Archie and Kim," Simpson said of course he knew them.  He told detectives that he

did not scare easily and was not afraid because one detective was yelling in his face and trying to scare him. Regarding the second interview in fall 2002, Simpson denied that he said that he did not know who Crook and Kimbler were. Simpson denied ever having been to Durrance's house in 1999 and denied ever telling Durrance that he killed Big Archie and Kimbler.

Simpson testified that he knew he was putting himself in danger by informing on Durrance. He also testified that Big Archie told him that he had heard from Little Archie that Simpson was working for the police. Simpson said he "might have" or "very possibl[y]" paged Big Archie the day before the murders because it would not have been out of the ordinary to do so.

An electric reliability specialist with the JEA confirmed that there was a three-minute power outage at Simpson's mother's house at 7:46 a.m. on July 16, 1999. JEA also received a call that morning from a caller identified as "Mr. Simpson," approximately ten minutes after the outage.

Simpson also presented the testimony of Terry Thompson, Little Archie's cousin. Thompson testified that he saw Little Archie and Smallwood at the RaceTrac gas station about three or four

miles from Big Archie's house at around midnight on July 16, 1999. After he saw Little Archie and Smallwood, Thompson went to Big Archie's house to see if Big Archie was there, but there was no answer. Dana Guinn, the father of Thompson's girlfriend, testified that he was with his daughter and Thompson in the car at the RaceTrac on July 15, 1999, at 11:30 p.m. When Little Archie and Smallwood first pulled into the RaceTrac, Guinn thought they may have been a little jittery, but they were kidding around with Thompson, who got out of the car to talk to them. Once they left the gas station, Guinn, Thompson, and Guinn's daughter went directly to Big Archie's house. Thompson went around the back to tell Big Archie that they wanted to hook up a telephone line, but no one came to the door.

The jury found Simpson guilty of both murders, and the trial court ultimately imposed a sentence of death for each murder. *Simpson v. State*, 3 So. 3d 1135, 1138-39 (Fla. 2009). Simpson appealed, and this Court affirmed the convictions and sentences in 2009. *Id.* at 1149. Simpson subsequently filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.851 and several amendments thereto. The trial court held a

twelve-day evidentiary hearing, and thirty-seven witnesses testified.

Following the evidentiary hearing, the trial court entered an order

on July 6, 2018, denying in part Simpson's motion and granting in

limited part Simpson's motion as to the penalty phase under *Hurst

v. State*, 202 So. 3d 40 (Fla. 2016), *receded from in part by State v.

Poole*, 297 So. 3d 487 (Fla. 2020), *cert. denied*, 141 S. Ct. 1051

(2021).

## II. ANALYSIS

Simpson now appeals the denial of relief as to the guilt phase

raising numerous claims[4] and has petitioned this Court for a writ of

---

4. The claims raised by Simpson are (1) trial counsel was ineffective for failing to object to improper arguments during the State's closing arguments; (2) the State violated *Giglio v. United States*, 405 U.S. 150 (1972), by knowingly misrepresenting Simpson's release date, and trial counsel was ineffective in failing to respond with readily available evidence that would have shown the State's position was false; (3) the State committed a *Giglio* violation by knowingly misrepresenting Kimbler's injuries in closing argument; (4) newly discovered evidence in the form of Durrance's recantation; (5) the State violated *Giglio* and *Brady* by knowing and concealing evidence tending to show that Durrance's testimony was false; (6) trial counsel was ineffective in failing to discover and use the impeachment evidence referenced in claim 5; (7) the State violated *Giglio* by knowing that its alternative explanation for how Simpson could have entered the house was false, and trial counsel was ineffective for failing to show that it was false; (8) the State violated *Brady* by failing to disclose that Little Archie was a confidential informant against Durrance in another case; (9) the

- 17 -

habeas corpus.  Of the numerous *Brady* claims presented in this appeal, we conclude that one claim is dispositive—the State's failure to disclose that prior to Simpson's trial, Little Archie had served as a confidential informant against Durrance in another case.

---

State violated Simpson's due process rights by failing to preserve the evidence in this case for future DNA testing; (10) the postconviction DNA testing warrants a new trial; (11) trial counsel was ineffective for failing to independently test the DNA evidence; (12) trial counsel was ineffective for failing to effectively consult with the court-appointed DNA expert; (13) trial counsel was ineffective for failing to find and use Shannon Elliot, who allegedly had information inculpating Little Archie; (14) trial counsel was ineffective for failing to interview and prepare Misty McNeish to testify at trial so that she would inculpate Little Archie; (15) trial counsel was ineffective for failing to show that Little Archie knew the positions of the bodies before anyone could have told him; (16) trial counsel was ineffective for failing to discover and present evidence that Little Archie lied about his whereabouts the night of the murders; (17) trial counsel was ineffective for presenting an incoherent closing argument; (18) newly discovered evidence in the form of testimony from Little Archie and Terry Thompson that tended to corroborate Simpson's defense that Little Archie had taken the clothes from Simpson's trailer a few weeks before the murders; (19) the State committed *Brady* and *Giglio* violations by misleading the jury into believing that the last number to page Big Archie belonged to Simpson's mother; (20) the State violated *Brady* or *Giglio* or trial counsel was ineffective related to Detective Hinson's testimony; (21) trial counsel was ineffective for failing to use available work records to corroborate Simpson's explanation that he had to leave the interview with detectives because he was late to work, and the State violated *Brady* by concealing the fact that Simpson told the detectives this before they mentioned the murders; and (22) cumulative prejudice warrants relief.

- 18 -

Accordingly, we focus our analysis on this claim and do not address the remaining claims.

"*Brady* requires the State to disclose material information within its possession or control that is favorable to the defense." *Davis v. State*, 136 So. 3d 1169, 1184 (Fla. 2014). To establish a *Brady* violation, a defendant must demonstrate that "(1) the evidence was either exculpatory or impeaching; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) because the evidence was material, the defendant was prejudiced." *Id.*; *see also Brady*, 373 U.S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

"Under *Brady*, the undisclosed evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Guzman v. State*, 868 So. 2d 498, 506 (Fla. 2003) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "The determination of whether a *Brady* violation has

occurred is subject to independent appellate review." *Davis v. State*, 928 So. 2d 1089, 1113 (Fla. 2005).

Simpson argues that the State violated *Brady* by failing to disclose that prior to Simpson's trial, Little Archie had served as a confidential informant against Durrance. At the evidentiary hearing, FDLE Agent Mark Brutnell testified that he was involved in a multi-agency, multi-jurisdiction narcotics investigation in 1999-2000 that resulted in the arrest and prosecution of Durrance for drug trafficking. He and then-JSO Officer Bates[5] authored an application for a wiretap on Durrance's phone. Little Archie was "Source Number Five" in the wiretap application, which detailed Little Archie's account that Durrance had threatened to harm Big Archie after the cocaine Durrance had fronted him was stolen and Big Archie could not repay Durrance, as well as Durrance's ruse of selling them fake cocaine to get his money back. Little Archie was not paid for the information, but he was in jail at the time and hoping to get consideration regarding his own then-pending federal

---

5. At the time of the evidentiary hearing, Bates was an FDLE Agent.

counterfeiting charges. Little Archie also gave an interview from which FDLE gleaned information. Agent Brutnell did not indicate that Little Archie received any benefit from his interview with FDLE. Agent Bates also testified that Little Archie was a source used in the wiretap application for Durrance and that he was not paid for his information.[6] He did not recall if Little Archie was attempting to get favorable treatment or leniency on some criminal charges against him.

There was testimony at the evidentiary hearing that Little Archie told an assistant state attorney or one of the investigators that Durrance had killed a drug dealer in West Palm Beach. When asked about information he had provided to the State at the evidentiary hearing, Little Archie testified that he told JSO he thought Durrance had killed Big Archie in retaliation for the drug disputes. He told Assistant State Attorney Mark Caliel that Durrance had admitted to killing the dealer in West Palm Beach who had sold Durrance the fake cocaine. After Little Archie testified as a State's witness against Simpson, the State brought Little

---

6. In listing Little Archie as a witness against Durrance in the trafficking case, the State listed his address as "c/o Chuck Bates."

Archie down to West Palm Beach where he testified against Durrance.

The trial court denied this claim, finding no evidence that Little Archie acted as a paid, confidential informant in Durrance's trafficking case and that there was no indication that these agencies made any deals with Little Archie for his cooperation. As a result, the trial court did not reach the issue of prejudice. After careful review of the entire record in this case, we do not agree with the conclusion of the trial court that there was no *Brady* violation, and we conclude that the *Brady* violation undermines our confidence in the outcome of Simpson's trial.

Here, the first two prongs of *Brady* are satisfied—this was impeachment evidence, and the State does not dispute that it should have but failed to turn over this information. As to the materiality prong, the Court's opinion in *Gorham v. State*, 597 So. 2d 782 (Fla. 1992), in which it was faced with a similar scenario, is instructive. In *Gorham*, the Court wrote:

> The State contends that Johnson's informant status in other cases cannot be deemed *Brady* material in the instant case and that there is no evidence that Johnson was a confidential informant in this case. We do not agree with the State's contentions. The Florida Evidence

Code provides that the credibility of a witness may be attacked by showing that the witness is biased. § 90.608(1)(b), Fla. Stat. (1981). A witness' relationship to a party, personal obligations to a party, or employment by a party all have been recognized as proper questions on cross-examination going to the interest and bias of the witness. Charles W. Ehrhardt, *Florida Evidence* § 608.4 (2d ed. 1984).

The State admits that Johnson was a confidential police informant on other occasions. Even though the police did not reveal Johnson's informant status to the state attorney who prosecuted Gorham's case, the state attorney is charged with constructive knowledge and possession of evidence withheld by other state agents, such as law enforcement officers. *State v. Coney*, 294 So. 2d 82 (Fla. 1973); *see also State v. Del Gaudio*, 445 So. 2d 605 (Fla. 3d DCA), *review denied,* 453 So. 2d 45 (Fla. 1984). At the evidentiary hearing on Gorham's 3.850 motion, the state attorney stated that had he known about Johnson's informant status he would "certainly" have given that information to the defense because it "comes within the *Brady* definition." Receipts from the Pompano Police Department show that Johnson received substantial payments for confidential information relating to other cases. A receipt dated June 9, 1982, also indicates that while Johnson was incarcerated during the period between Gorham's two trials she received ten dollars related to this case from the Pompano police. This information was never disclosed to Gorham, and, thus, the defense was unable to attack Johnson's credibility by showing that she was biased.

In evaluating *Brady* claims, courts must determine whether the withheld evidence is "material," rather than just favorable to the accused. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The standard for

- 23 -

> determining "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* Given this trial's circumstantial nature, Johnson's role as the State's key witness, and the defense's inability to impeach Johnson based upon the undisclosed evidence, we find that such a reasonable probability exists in this case.

*Id.* at 784-85 (footnote omitted).

Here, Little Archie was confidential "Source Number Five" in the wiretap application that led to the arrest and prosecution of Durrance for drug trafficking. As in *Gorham*, because Little Archie had been an informant in another case, he had a "relationship to a party" that was a potential source of bias requiring disclosure. And disclosure of a witness' informant status is required even where there is no evidence that the witness was given favorable treatment in exchange for the information. *See Hendrix v. State*, 908 So. 2d 412, 424 (Fla. 2005) (concluding that the State's failure to disclose that one of the witnesses was a confidential informant for the State "was impeachment evidence that should have been disclosed" where the record refuted the claim that the witness was treated favorably or provided anything in exchange for the testimony).

The State argues that even if this evidence could have had impeachment value, it was not material as Little Archie was

impeached at trial with his own motive to kill his father. "However, the fact that a witness is impeached on other matters does not necessarily render the additional impeachment cumulative." *Cardona v. State*, 826 So. 2d 968, 974 (Fla. 2002); *see also United States v. Rivera Pedin*, 861 F.2d 1522, 1530 (11th Cir. 1988) ("We acknowledge that Ream's credibility had been eroded due to the testimony the defense elicited from him on cross-examination. The disclosure of Ream's conversation with Miller, however, would not have been merely repetitious, reinforcing a fact that the jury already knew; instead, 'the truth would have introduced a new source of potential bias.' " (quoting *Brown v. Wainwright*, 785 F.2d 1457, 1466 (11th Cir. 1986))). Here, the jury did not hear testimony regarding Little Archie acting as a confidential informant; therefore, this would have introduced a new source of potential bias.

With regard to the significance of this evidence, we note that both Durrance and Little Archie were crucial witnesses for the State. Simpson was convicted primarily based on Durrance's testimony at trial that Simpson confessed to him and circumstantial evidence of Simpson's DNA on clothes found a few days after the murders on the property adjoining the home of Big

- 25 -

Archie and Kimbler. At trial, Simpson did not deny that the clothes found belonged to him but provided an explanation as to how his clothes ended up near the murder scene—Little Archie took them from his house. And the State's expert testified, on both direct and cross-examination, that he could not exclude Little Archie from some DNA mixtures present on the clothes. Contrary to Simpson's trial testimony, Little Archie denied having gone over to Simpson's trailer in the days prior to the murder and denied having ever borrowed any clothing from Simpson.[7] Accordingly, evidence that Little Archie served as a confidential informant against Durrance would have allowed the defense to impeach Little Archie on a new source of bias (one not revealed to the jury at trial). *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

_____

7. Little Archie's testimony at the evidentiary hearing corroborated Simpson's testimony at trial regarding having been to Simpson's trailer, borrowing clothes, and finding the detective's business card.

Little Archie also testified at the evidentiary hearing that he told JSO that he thought Durrance killed Big Archie in retaliation for the drug disputes and that he told Caliel that Durrance admitted to killing the drug dealer in West Palm Beach who sold Durrance fake cocaine. Simpson argues that with this evidence, the defense could have challenged why the State quickly dismissed Little Archie as a suspect because he was a valuable source of information. The relationship between Simpson, Little Archie, and Durrance was of critical importance in this case, and the information Little Archie provided to law enforcement pertaining to Durrance casts a different light on this relationship. At trial, the defense's overarching theory of the case was that Little Archie, Smallwood, and Durrance were all involved in the homicides. Simpson denied that he killed Big Archie and Kimbler, denied ever having been to Durrance's house in 1999, denied ever telling Durrance that he killed Big Archie and Kimbler, and testified that he had no reason to murder Big Archie and Kimbler. Further, the person who was known to have seen Big Archie and Kimbler within an hour of their deaths and the only person to refute Simpson's testimony that Little Archie had taken the sweatclothes from

Simpson's trailer—Little Archie himself—also had motive and opportunity to kill the victims and had threatened to kill them, as well as Kimbler's unborn child. Little Archie also knew details of the crime, including the position of the bodies of Big Archie and Kimbler. Moreover, at the time of Simpson's trial, Little Archie was incarcerated in federal prison for conspiracy to distribute drugs. Therefore, the undisclosed evidence that Little Archie was a confidential informant for the State was material.

Further, Little Archie's testimony and credibility were of significant consequence when we consider the lack of evidence linking Simpson to the scene of the crime. Despite the DNA evidence in this case, it was not a slam dunk for the State, and there were a number of weak points. As counsel pointed out in closing, the police failed to investigate much of the evidence they would later testify incriminated Simpson, the shoes found at the church did not match the prints at the crime scene, the tire tracks from the scene did not match any of the vehicles Simpson had access to at the time, the crime scene technicians failed to collect much of the trace evidence from the room in which the victims were found, law enforcement failed to record any of the interviews during

their investigation, some of those who handled the evidence failed to follow standard operating procedures, and the State only tested a small fraction of the biological evidence from the crime scene. There was no evidence placing Simpson in Big Archie and Kimbler's home on the night of the murders and no evidence to rebut Simpson's testimony that he was at his mother's house at the time of the murders. And although there was evidence of a confession, it came years after the murders from a witness who both had a motive to kill one of the victims himself and who was in jail due to information provided by Simpson.

Accordingly, the State's failure to disclose evidence that Little Archie had served as a confidential informant against Durrance constitutes a *Brady* violation and undermines our confidence in the outcome of this case.[8]

---

8. We also agree with Simpson that trial counsel's performance was deficient in failing to object to several of the State's comments in closing argument. However, these errors standing alone do not constitute grounds for a new trial. Accordingly, because we conclude that the *Brady* violation alone merits reversal for a new trial, we do not address these claims or cumulative prejudice in further detail.

# III. CONCLUSION

Because we conclude that the *Brady* violation undermines confidence in the outcome of the trial, we reverse the denial of postconviction relief as to the guilt phase, vacate Simpson's convictions for first-degree murder, and remand to the trial court for a new trial. In light of the vacation of the convictions and remand for a new trial, Simpson's petition for a writ of habeas corpus, raising claims of ineffective assistance of appellate counsel, is dismissed as moot.

It is so ordered.

POLSTON, LABARGA, LAWSON, COURIEL, and GROSSHANS, JJ., concur.
CANADY, C.J., dissents with an opinion.
MUÑIZ, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, C.J., dissenting.

Because I would conclude that the State's failure to disclose evidence that Little Archie had served as a confidential source against Durrance was not material under *Brady*, and does not undermine confidence in the outcome even when considered cumulatively with counsel's deficiency in failing to object to several

- 30 -

of the State's comments during closing argument and other improper comments made by the State that were raised on direct appeal, I would affirm the trial court's denial of postconviction relief as to the guilt phase. I would also deny Simpson's habeas petition on the merits. I therefore dissent.

The majority first claims that the fact that Little Archie provided confidential information that was used in a wiretap application made in Durrance's trafficking case means that "he had a 'relationship to a party' that was a potential source of bias requiring disclosure" under our decision in *Gorham v. State*, 597 So. 2d 782 (Fla. 1992). Assuming that the State was required to disclose Little Archie's history as an informant against Durrance, its failure to do so was not material. The fact that Little Archie had an interview[9] with Agent Brutnell and then-JSO Officer Bates from which they "gleaned" information about Durrance while Little Archie was in jail on his own federal charges does little, if anything,

_____

9. Although the record indicates only one such interview took place on January 7, 2002, the majority seems to imply there were two. *See* majority op. at 20-21.

- 31 -

to suggest Little Archie was biased toward the State in this case.[10] Agent Brutnell testified at the evidentiary hearing that by providing information about Durrance, Little Archie was attempting to obtain a benefit in his then-pending federal counterfeiting case; he was not attempting to aid law enforcement because of a bias toward law enforcement or the State. Indeed, as a serious drug dealer (which Little Archie admitted to being when providing the information used in the wiretap application) under prosecution, he was likely quite biased against law enforcement. Under questioning by the defense at Simpson's trial, Little Archie testified that he was familiar with Officer Bates and did not like him, stating, "He was a narcotics agent, sir. I was out there selling drugs. He was trying to put me in jail." Further, at the time of Simpson's trial, there were many other

_____

10. Agent Brutnell testified at the evidentiary hearing that FDLE did not consider Little Archie a "true," "documented," confidential source and there was no documentation or record that he was one of the twelve confidential sources who provided information used in the Durrance wiretap affidavit; Agent Brutnell just happened to remember that he was. Agent Bates also testified that JSO did not consider Little Archie a "documented" informant with respect to the Durrance investigation; since he was not paid, there would not have been any record of him having been a "source."

and greater reasons why the jury could have concluded that Little Archie was biased towards the State in this case, e.g., this was the prosecution of his father's alleged murderer and he would have wanted justice to be done, or, as Simpson theorizes, Little Archie was the real murderer of Big Archie and Kimbler and therefore had every reason to want Simpson convicted instead of facing prosecution himself. There was no testimony at the evidentiary hearing that any agency made a deal with Little Archie for the information he provided. And at the time, Little Archie was facing federal counterfeiting charges, for which none of the agencies involved in Simpson's case had the authority to offer Little Archie any sort of consideration. To the extent that Little Archie had a relationship with law enforcement that would show bias, it was exceedingly minimal.

The failure to disclose a witness's informant status is not always material. The majority cites *Hendrix v. State*, 908 So. 2d 412 (Fla. 2005), majority op. at 24, a case in which we determined that the failure to disclose the confidential informant status of one of the witnesses against Hendrix, Roger LaForce, was not material. During postconviction proceedings, Hendrix alleged that the State

violated *Brady* by failing to disclose that LaForce had previously been a confidential informant for the State in investigations unrelated to Hendrix's case. 908 So. 2d at 423.[11] The trial court determined that LaForce's history as an informant was impeachment evidence that should have been disclosed but that Hendrix was not prejudiced by the failure to disclose this information. *Id.* at 424. On appeal, this Court agreed that Hendrix was not prejudiced. *Id.* at 424-25. The Court noted that "LaForce's prior assistance as a cooperating defendant, which occurred over a year prior to Hendrix's arrest, would have had a minimal impact, if any," and that "[t]he more damaging evidence regarding LaForce, that he heard [Hendrix's] confession while in prison and contacted the State because he was seeking a deal, had already been presented to the jury." *Id.* at 425.

Here, Little Archie provided the information used in the wiretap application in Durrance's case in January 2000; Simpson was not arrested until almost three years later in September 2002.

---

11. Hendrix also alleged that LaForce was given favorable treatment in exchange for his testimony at Hendrix's trial, which was refuted by the record. 908 So. 2d at 424.

Simpson's jury was aware that Little Archie was incarcerated on federal drug charges at the time he testified at Simpson's trial. The jury also was made aware of "the more damaging evidence" regarding Little Archie—that he had threatened to kill his father, Kimbler, and their unborn child; that he had a financial motive to kill his father; that he had the opportunity to commit the murders; and that he knew the positions in which the bodies were found. As in *Hendrix*, because of this "more damaging evidence" regarding Little Archie's bias that was presented to the jury, his prior assistance as one of the twelve confidential sources who, nearly three years prior to Simpson's arrest, provided information used in the Durrance wiretap application, would have had a minimal impact, if any. Even if the jury had heard "testimony regarding Little Archie acting as a confidential informant," majority op. at 25, which "would have introduced a new source of potential bias," *id.*, its minimal impact certainly would not have put the entire case "in such a different light as to undermine confidence in the verdict," *Sweet v. State*, 293 So. 3d 448, 451 (Fla.) (quoting *State v. Huggins*, 788 So. 2d 238, 243 (Fla. 2001)), *cert. denied*, 141 S. Ct. 909 (2020).

The majority seems to find meritorious Simpson's argument that if he had been aware at the time of his trial that Little Archie had provided the JSO with his "thought [that] Durrance killed Big Archie in retaliation for the drug disputes and that [Little Archie] told Caliel that Durrance admitted to killing the drug dealer in West Palm Beach,"[12] he "could have challenged why the State quickly dismissed Little Archie as a suspect [which was] because he was a valuable source of information." Majority op. at 27.[13] But that argument is nonsensical because Simpson was also a valuable source of information (seemingly even more valuable than Little Archie based on the record before us) to the JSO, Clay County detectives, the DEA, and the FBI in many state and federal investigations involving murder, robbery, burglary, auto theft, and narcotics. He was providing information regarding the potential involvement of Durrance, Little Archie, and other individuals in

12. Simpson did not include this point within his Second Amended Motion for Postconviction Relief below.

13. The evidence presented at the evidentiary hearing was that Little Archie was dismissed as a suspect because he passed a polygraph.

another homicide and informing on Little Archie's involvement with drugs and burglaries and Big Archie's narcotics operation.

Further, the fact that Little Archie informed against Durrance does nothing to support Simpson's theory at trial that Little Archie, Durrance, and Smallwood were responsible for the murders, as the majority suggests. To the contrary, it cuts against it. If Little Archie and Durrance were—as the defense contends—cohorts in the murders of Big Archie and Kimbler, it seems highly unlikely that Little Archie would draw attention to Durrance by implicating him in an unrelated murder. Such an action could potentially boomerang on Little Archie by provoking a counter-accusation regarding the murders of Big Archie and Kimbler. The majority does not explain how it believes "the information Little Archie provided to law enforcement pertaining to Durrance casts a different light on this relationship" of "critical importance" between Simpson, Little Archie, and Durrance. Majority op. at 27. But the fact that Little Archie informed on Durrance after the murders suggests that Little Archie and Durrance did not have the type of relationship that would be expected of cohorts in a double murder. And although the majority suggests that Little Archie having

informed on Durrance would have affected the jury's perception of his credibility at Simpson's trial, it again fails to explain how.[14]  The jury already likely perceived Little Archie as less than credible based on his potential motives in seeing Simpson convicted, his criminal record, and his evasiveness and apparent memory lapses during his testimony.

The fact that Little Archie had been a source to law enforcement in unrelated matters is of little, if any, relevance, and in light of the other information known to the jury about Little Archie, would not have been an indication that he had a particular bias toward law enforcement or the State.  There is no reasonable probability that had this information been disclosed to Simpson, the result of Simpson's trial would have been different.  I would thus conclude that the State's failure to disclose that Little Archie had previously informed against Durrance was not material and did

---

14.  And the majority's claim that "Little Archie's testimony at the evidentiary hearing corroborated Simpson's testimony at trial regarding having been to Simpson's trailer, borrowing clothes, and finding the detective's business card," majority op. at 26 n.7, is not only irrelevant to the materiality of the *Brady* claim but also inaccurate.  Nothing in Little Archie's evidentiary hearing testimony corroborates Simpson's trial testimony that Little Archie borrowed the sweatclothes used in the murders from his trailer.

not prejudice Simpson. Assuming, however, that the first two *Brady* prongs were satisfied, I would include this claim in a cumulative prejudice analysis.

I agree with the majority that trial counsel's performance was deficient in failing to object to several of the State's comments in closing argument—namely that "[p]hysical evidence cannot be wrong," "[i]t is impossible for the criminal to act without leaving behind traces of his presence," and "there is no unidentified forensic evidence belonging to anybody else inside of this murder scene and there is no unidentified blood on any of this clothing." While these comments standing alone did not prejudice Simpson, I would consider them in a cumulative prejudice analysis along with the State's failure to disclose Little Archie's history as a confidential source and the improper prosecutorial comments that were identified on direct appeal as capable of being construed as improper bolstering. *See Simpson v. State*, 3 So. 3d 1135, 1147 n.7 (Fla. 2009).

I would conclude that in the context of this case, the comments that "[p]hysical evidence cannot be wrong" and "[i]t is impossible for the criminal to act without leaving behind traces of

- 39 -

his presence" did not prejudice Simpson.  In fact, I would view the State's argument that it is impossible for a criminal to act without leaving behind traces of his presence to have been favorable to Simpson, because there was no physical evidence inside the crime scene linked to Simpson.  I would find any prejudice from the State's comment that "there is no unidentified forensic evidence belonging to anybody else inside of this murder scene and there is no unidentified blood on any of this clothing" to be very limited in light of the brevity of the statement and the contradictory evidence presented at trial.  The comments made by the State in its closing argument that we stated on direct appeal could be construed as impermissible bolstering, were brief and only minimally prejudicial.

Individually, the prejudice resulting from the improper prosecutorial comments and the failure to disclose that Little Archie had previously acted as a confidential source ranges from not prejudicial to minimally prejudicial.  Even when considered cumulatively, I would conclude that the prejudice of these errors is minimal and does not undermine confidence in the outcome of Simpson's trial.

Because I conclude that the failure to disclose Little Archie's history as a confidential source was not material under *Brady*, that the cumulative effect of this failure together with the improper comments made by the State during its closing do not undermine confidence in the outcome of the trial, and that Simpson's other claims are without merit, I would affirm the denial of postconviction relief as to the guilt phase and deny Simpson's habeas petition on the merits.

An Appeal from the Circuit Court in and for Duval County,
    Michael R. Weatherby, Judge
    Case No. 162002CF011026AXXXMA
And an Original Proceeding – Habeas Corpus

John S. Mills, Thomas D. Hall, Courtney Brewer, Jonathan Martin, and Bailey Howard of The Mills Firm, P.A., Tallahassee, Florida; and Sonya Rudenstine, Gainesville, Florida,

    for Appellant/Petitioner

Ashley Moody, Attorney General, and Michael T. Kennett, Assistant Attorney General, Tallahassee, Florida,

    for Appellee/Respondent

Amity Boye and Ariel Oseasohn of White & Case LLP, New York, New York, and Raoul G. Cantero of White & Case LLP, Miami, Florida,

    for Amici Curiae the Innocence Project and Innocence Project of Florida